Mars, Appellant, *v.* Philadelphia
Rapid Transit Co.

Submitted January 6, 1931. Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SCHAFFER and MAXEY, JJ.

*Ralph B. Umsted,* of *Umsted & Wolfe,* for appellant. —The negligence of defendant consisted, inter alia, of defendant's motorman turning off the headlight which would show the road and the track in advance of the car 150 feet or more, without slackening the speed of his car which was 25 miles an hour, particularly in view of the fact that he knew and had a right to expect pedestrians to be on or near the track in front of him: Wilhelm v. Ry., 281 Pa. 69; Robinson v. Twp., 90 Pa. Superior Ct. 139; Algard v. Transit Co., 266 Pa. 390; Foster v. Power & Light Co., 100 Atl. (Me.) 833.

Defendant's car killed deceased: Davis v. Davis, 80 Pa. Superior Ct. 343.

The deceased was not negligent: Donahue v. P. R. T., 293 Pa. 253; Gilmore v. Ry., 153 Pa. 31; Gilmartin v. Transit Co., 186 Pa. 193; Warner v. Ry., 141 Pa. 615.

*Marshall A. Coyne,* for appellee, cited: Kilgallen v. Transit Co., 300 Pa. 451; Walker v. Traction Co., 97 Pa. Superior Ct. 7.

OPINION BY MR. JUSTICE MAXEY, February 3, 1931:

At about 7:15 P. M., February 10, 1930, defendant's trolley car was proceeding south on the so-called Easton Road, located in the section known as North Willow Grove, in the County of Montgomery, at the rate of about 25 miles an hour. It was equipped with a headlight which gave the motorman a view of the tracks for a distance of 150 feet. When the motorman was about 200 yards from the point where the occurrence herein discussed took place, he switched off the headlight and put on the "dimmer." The latter gave him a view of the track for about 15 or 20 feet ahead. He did this for the purpose of accommodating several northbound motorists who were approaching on the above road parallel to the street car tracks. When the motorman again switched on his headlight, he saw before him at a distance of 25 feet, the body of a man lying between the two rails. This man was on his left elbow, apparently attempting to rise. The motorman applied his brakes, but before the car came to a stop he had struck the man and dragged him for a distance of 23 feet, the wheel fender pushing the body along. A short time afterward, the body was removed from under the car and placed at the side of the track, where the man was pronounced dead. This man was Elwood F. Mars, the husband of the plaintiff. No autopsy was had and there was no medical testimony as to the cause of death. The only physician who testified

described the injuries sustained by the deceased as follows: "He had a head injury,......on the left side, from which he apparently had quite a little bleeding. ...... He had a rather severe laceration of the scalp." This same witness testified that he was in no position to say what the cause of death was. An examination of the ground, within an hour after the deceased was struck, and also on the following morning, revealed a pool of blood from six to seven inches in diameter at the place where the deceased was struck, and a larger pool of blood 23 feet farther south. These two pools were connected by a streak of blood. There was no blood outside of the tracks.

The case was tried and a verdict was returned for the plaintiff for $16,500. The court in banc later entered judgment in favor of the defendant, notwithstanding the verdict. The court based its judgment n. o. v. on two propositions: First, that the motorman was not guilty of any act of negligence in using bright lights and dim lights alternately when the exigencies of the case demanded them. The second was that, under the facts in the case, there was no proof that death was due to the negligence of the defendant.

As to the first proposition, we think that under the facts the question of the defendant's negligence was for the jury. The car was traveling at the rate of 25 miles an hour, and, according to the motorman, when only the dimmers were on, objects were visible "in dark places" not over 20 feet ahead. A car traveling at the rate of 25 miles an hour is traveling at the rate of $36\frac{2}{3}$ feet per second. For a motorman to drive his car ahead at this rate of speed into a darkness which is only 20 feet distant is an act that any jury would be justified in characterizing as negligence. It bears close kinship to the proverbial "leap in the dark." Passengers in a trolley car traveling at the speed stated would be ill at ease if they knew that the motorman was unable to see objects on the track more than 20 feet distant. Not only

might a human being, as in the present case, be on the track, but a rail might be displaced, or there might be a fallen pole or tree or other obstruction on the track which would be sufficient when the car encountered it to derail or wreck the car. As to whether or not the act of driving a car at the rate of 25 miles an hour, with the headlight switched off and the dimmers switched on, which dimmers threw a light in front of the car not over 20 feet, is an act which under the circumstances constituted want of care, is indicated by the legislative expression as to how far a light on an automobile must, in order to insure human safety, project its beams ahead. For example, the Motor Code of May 1, 1929, P. L. 905 (paragraph a, section 803), provides as follows: "The head lamps or head lamp of motor vehicles shall be so constructed, arranged, adjusted and attached that, except as provided in this act, they will, at all times mentioned in this act, and under normal atmospheric conditions, and on a level road, produce a driving light sufficient to render clearly discernible all vehicles, persons or substantial objects 160 feet ahead." The act further provides (paragraph e, section 803) : "Whenever a motor vehicle meets another vehicle on any highway, it shall be permissible to tilt the beams or beam of the head lamps or head lamp downward, or to substitute therefor the light from auxiliary driving lamps, subject to the requirement that the tilted beams shall give sufficient illumination, under normal atmospheric conditions, and on an approximately level highway, to render clearly discernible vehicles, persons, or substantial objects 75 feet ahead of the motor vehicle, but shall not project a glaring or dazzling light to persons in front of the motor vehicle."

In other words, in the circumstances under which the street car referred to in this case was proceeding, that is, under normal atmospheric conditions, and on an approximately level highway, the legislature of Pennsylvania has decreed that no automobile shall proceed,

even temporarily, with lights that do not illuminate the road so as to render clearly discernible vehicles, persons or substantial objects 75 feet ahead of the motor vehicle. While, of course, this Motor Code does not apply to the operation of street cars, the sections of the Code cited by us indicate that in the opinion of the legislature no motor vehicle can proceed with safety at any speed, for even a temporary period, unless substantial objects are visible at least 75 feet ahead of the motor vehicles. This is essential to the safety of vehicles, of occupants and of others. The powerful headlights of locomotives, illuminating the tracks for great distances ahead, also indicate the importance those entrusted with the management of railroads attach to the effective illumination of the track ahead of a train on even a private right-of-way.

This court has held that to drive an automobile with visibility ahead limited to 15 or 20 feet is evidence of negligence. In the case of Mason v. Lavine, Inc., Mr. Justice SCHAFFER, in an opinion handed down on January 5th, last, used the following language: "Can it be said that one is not negligent who drives an automobile on a rainy, foggy, slippery night at a speed of between 20 and 25 miles an hour, whose visibility is limited, owing to the condition of his headlights, to 15 or 20 feet, who is just coming out of a slight patch of fog, who does not know in what distance he can stop his car under such conditions, but who is of opinion that on a dry roadbed he could stop it within 10 or 15 feet (which we may remark is denied in the tables prepared by automobile engineers of wide experience, where the stopping distance at 25 miles an hour is given as 58 feet and at 20 miles as 37 feet) . . . . . . Such celerity of movement under the conditions which he describes could not be determined to be with due care."

Under the circumstances of this case, the speed of the car and the visibility ahead should have been so related to each other that the car could in a sudden

emergency like the one that presented itself to the motorman in the instant case, be stopped within a distance not greater than the length of that visibility. There was no such relationship here between speed and visibility. While the dimmers were on, the motorman did not see on the tracks the man who apparently was attempting to rise. It was only when the headlights were turned on that the body became visible to the motorman. At that moment the body was 25 feet from the car. Though the emergency brakes were immediately applied, the car not only struck the body but dragged it 23 feet before coming to a stop. It follows that the speed of the car was such that the motorman was unable to stop it in less than 48 feet, yet until 20 feet from the point where the body of the deceased lay on the track, this car had for a distance of 600 feet been running with no forward illumination except from the dimmers, which projected light ahead, as the motorman testified, "not over 12 or 15 feet—maybe 20 feet."

At the point of the accident, and for a long distance north and south of that point, the street railway was separated from the highway by a space of about 3½ feet of rough macadam which had been used for many years by the public as a pathway. The defendant company might reasonably have anticipated that obstructions of some kind, either persons or automobiles or the wreckage of automobiles, or other objects, might occasionally be on the track, and therefore, due care required that when the car was proceeding at the rate of 36⅔ feet per second, the tracks should be visible to the motorman for a distance greatly in excess of 15 or 20 feet. In the case of Algard v. P. R. T. Co., 266 Pa. 390, the present Chief Justice said (at page 393) : "If the extent of the motorman's vision through the window in front of him was diminished or interfered with by drizzling rain falling on the glass at the time, as he testified, it was his duty, before proceeding, to remove the hindrance to his view of the track." We think the principle under-

lying this statement is equally applicable to the case at bar. The question of defendant's negligence was for the jury and their finding was warranted by the evidence.

The second proposition upon which judgment n. o. v. was entered was that there was no sufficient proof that deceased's death was due to the act of the defendant. The court said in its opinion entering judgment n. o. v.: "Automobiles were passing continuously during this time over the highway alongside of the track; it may have been possible that he [the deceased] was struck by a passing automobile and thrown upon the tracks. The negligence of the defendant may be established by circumstantial evidence where it creates a reasonable possibility of the defendant's fault and excludes every other reasonable cause and where the defendant is responsible for only one of two or more causes and it is equally probable that the accident may have happened from either, there can be no recovery." In support of that paragraph the court below cited the cases of Cain v. Booth & Flinn, Ltd., 294 Pa. 334, and Flanigan v. Mc-Lean, 267 Pa. 553. These two cases differ widely in their facts from the case at bar, and the correct principles cited by the court below do not as applied to the facts of this case demand judgment n. o. v. In this case it is not "equally probable" that the death of plaintiff's decedent happened from two or more causes. That Mars was injured before the street car struck him is a logical inference from the finding of a pool of blood six or seven inches in diameter at the spot where he lay when the street car struck him. That blood obviously came from a wound not caused by the street car, for after the street-car struck him he did not remain long enough at that point for a pool of blood to form. During the time he remained under the street car, after the car stopped, a slightly larger pool of blood formed evidently from the same wound which caused the formation of the first pool. The wound from which the blood in

these two pools had come was the wound which the physician described as "a severe laceration of the scalp."

"A severe laceration of the scalp" is not a fatal wound, except in those cases where the wound becomes infected and death ensues several days later. There was no evidence that Mars' skull was fractured; in fact the circumstantial evidence is to the contrary. Had his skull been so gravely fractured a few moments before the street car struck him as to cause his death a few moments later he would have been lying unconscious on the tracks. The evidence is that just before the street car struck him he was slightly moving and was "right up on his elbow—trying to get up." This was the act of a conscious being. Something apparently had happened to him just before the street car struck him—the seven-inch pool of blood at that point indicates that he was injured before but not long before that moment. But his consciousness and his attempt to rise just before the street car came upon him indicates that he was not at that time injured fatally. If he had a head injury at that time sufficient to cause his death a few moments later, he would have been unconscious and helpless.

While he was conscious and attempting to get up, the street car hit him and pushed him along under the car a distance of twenty-three feet. When it stopped the deceased's head was, as the motorman testified, "back in under the fender." The fender referred to was the front wheel fender,—"the small fender right down next to the tracks that they press with the bolt, to try to pick up anything which would be on the rail" (as a witness described it). When Mars was taken from under the car "he never made a move or struggle of any kind," quoting from the motorman's testimony. A short time later, he was pronounced dead.

While there is no medical testimony as to the cause of death, this fact, like every other fact in issue in any case, may be inferred from circumstances. That the death of plaintiff's decedent was due to the street car striking

him and pushing him along the rail for 23 feet is a fact deducible as a reasonable inference from the facts and conditions directly proved and it cannot justly be classed as a mere conjecture or surmise or guess. In both the civil and criminal law, circumstantial evidence is competent evidence. In Com. v. Harman, 4 Pa. 269, 273, this court said, "All evidence is more or less circumstantial, the difference being only in the degree." In that case Chief Justice GIBSON used an illustration in which the cause of death was inferred, because, as he said, "we cannot account for the death on any other supposition." Chief Justice BIGELOW, in Com. v. Jeffries, 7 Allen (Mass.) 548, 563, said: "The process of ascertaining one fact from the existence of another is essential to the investigation of truth, and prevails in courts of law as well as in the ordinary affairs of life." In Gray v. Com., 101 Pa. 380, in which a defendant was on trial for his life, Justice PAXSON said: "We are not jurors and are not called upon to weigh the evidence ......further than to say......whether there is sufficient evidence to submit to the jury upon a particular question of fact." He also declared that absolute certainty is not required. Wigmore says in the second edition of his Evidence, volume 1, section 27, page 232: "The conclusions and tests of every day experience must constantly control the standards of legal logic." We think that according to the tests of every day experience, the court was justified in submitting to the jury the question of the proximate cause of the death of plaintiff's decedent and the jury was justified in finding that the proximate cause of death was the defendant's street car which struck the deceased and pushed him along the track for 23 feet. He was alive and conscious before being struck; he was dead when taken out from under the car. Though the specific injury which the street car inflicted on him was not disclosed, the inference that there was a fatal injury inflicted by the street car was

fairly drawn from legally sufficient circumstantial evidence.

In Strobel v. Park, 292 Pa. 200, this court, in an opinion by Mr. Justice KEPHART, said: "The test is whether the circumstances are such as to satisfy reasonable and well balanced minds that the accident resulted from the negligence of the defendant: King v. Darlington Brick and Mining Co., 284 Pa. 277. We have repeatedly stated that the testimony need not exclude everything which the ingenuity of counsel may suggest as having possibly caused or contributed to the death: Biesecker v. P. R. R. Co., 276 Pa. 87, 90; Gallivan v. Wark Co., 288 Pa. 443, 454. The rule certainly does not mean that one whose negligence kills a man, who had been suddenly taken ill at the moment, may escape responsibility on the theory that he may have been already dead, or would have died from natural causes. Of course, if it could be reasonably inferred that the man had been dead before he reached the floor, another question would be presented, but there is no evidence here which would justify such an inference. Where a man in apparent health is found dead, his head and body mutilated, and nothing more is known of the cause of his death, the most likely inference is that he died as the result of external violence. If the thing that produced such violence is known, it is the probable cause. This is only common sense and common experience, and the circumstances here are sufficient to make out a prima facie case of death by such violence."

In 17 C. J., section 56, page 1206, it is said: "Where death is the result of two concurrent causes, . . . . . . if one of the causes operates only slightly with the other which is the prominent efficient cause, then the proximate cause of death should be traced to the latter." In McHugh v. Schlosser, 159 Pa. 480, at 485, this court held that where an innkeeper pushed a sick guest out into the rain and cold and snow without adequate covering, he could be held liable in a civil action for the death of

the guest a short time later even though a post-mortem examination disclosed the fact that the immediate cause of death was valvular disease of the heart.

As to the third question, to wit: that the case presented disclosed the deceased as free from contributory negligence, there is no evidence that the street car line, at the locus of the occurrence, was on the defendant's exclusive property, and in the absence of such proof the presumption is that the deceased was not a trespasser.

The judgment of the court below is reversed and judgment is directed to be entered on the verdict.

Mr. Justice SCHAFFER dissented.