Neely et al. *v.* The Provident Life and Accident
Insurance Company, Appellant.

418

Argued May 28, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

*John A. Chambliss,* of *Sizer, Chambliss & Kefauver,* with him *Arthur H. Hull,* of *Snyder, Hull, Hull & Leiby,* for appellant.

*Paul G. Smith,* of *Nauman, Smith & Hurlock,* with him *William H. Neely* and *Charles C. Stroh,* for appellees.

OPINION BY MR. JUSTICE MAXEY, June 26, 1936:

Plaintiffs are beneficiaries in certain policies of accident insurance issued by the defendant to Dr. Edgar C. Neely, now deceased. One policy insured "against the effects of bodily injuries sustained directly, solely and exclusively through accidental means" in the prin-

cipal sum of $15,000 and weekly benefits. The other policy insured in the principal sum of $1,500 and weekly sickness and accident benefits "against loss of life, limb, limbs, sight of time, resulting without other contributing cause from bodily injury . . . which is effected solely by the happening of a purely accidental event." Since the plaintiffs in the two cases claimed under the same policies, a stipulation was filed to try both cases together, and, in the event of a verdict for the plaintiffs, the latter by stipulation agreed as to how the proceeds should be divided.

The insured died on October 3, 1932. Plaintiffs' averment was that "on or about August 20, 1932, while Dr. Neely was treating a patient, a piece of glass from an ampoule accidentally became imbedded in the forefinger of his right hand and that as a result the finger [later amputated] became infected with septic poisoning," which proved fatal.

Defendant denied these averments and declared "that leukemia and diabetes fundamentally predisposed to the gangrene of the right forefinger, requiring amputation thereof." Defendant set forth that the insured did not die as a result of septic poisoning but "from broncho-pneumonia, with leukemia as a secondary or underlying cause." *Webster's New International Dictionary,* 2d ed., defines "leukemia" as "a morbid state due to derangement of the blood-making organs and characterized by an excessive number of leucocytes [white corpuscles] in the blood."

After trial the jury returned a verdict for plaintiffs in the sum of $18,975. Defendant made a motion for judgment n. o. v., having at the trial presented a point for binding instructions in its favor. The motion for judgment n. o. v. was later overruled. This appeal followed.

On August 21, 1932, Dr. Neely showed his right index finger to Miss Hancock, who was a registered, trained nurse attached to his office and who was in his employ

for five years. Upon examining his finger she found a small puncture about the size of a pin head between the first joint and tip of his finger. Around this puncture there was an area of inflamed flesh about half the size of a dime. It was brought out on cross-examination of this witness that Dr. Neely had told her that he had loosened the flesh with a knife around the puncture. Miss Hancock sterilized a surgical knife, probed the wound, and therein felt a gritty substance of some kind which she was able to move backward and forward. She, treated the wound with lysol and mercurochrome. She saw the wound the next day, at which time the inflammation had increased. She and Dr. Neely then probed it. She treated the wound until August 29th when Dr. Neely consulted a physician. Dr. Neely was confined to his bed on September 3d and on September 5th was taken to the hospital where the wound in his finger was incised. Upon returning to his home he was confined to his bed and left it only when he went to his physician's office, until September 9th, when the inflammation had progressed just beyond the third finger and a few red streaks appeared beyond this joint. On September 16th he was taken to the hospital; the inflammation had increased and red streaks appeared upon his arm. On this day his finger was amputated. He returned to his home on September 17th and he was thereafter confined to his bed, and died on October 3d.

Dr. Lenker testified that when Dr. Neely came to him as a patient, he found him suffering intensely with pain. The witness gave as his opinion that the puncture that he described was caused by "external violence of some kind." After describing his patient's condition, he testified that the center "of infection was the site of the injury, the opening in his finger." He said the patient "was suffering from an infected hand, which later on developed into an infection which extended up his arm, which resulted in blood poisoning or what we call septicemia." He was asked: "How did the infection get in

his finger," and he answered: "Through the opening in his finger."

Dr. Smith testified that after the incision was made on the 5th of September, Dr. Neely showed signs of improvement, "then the infection seemed to progress until the 16th." He described Dr. Neely as suffering from "an infected wound of the finger." When asked his opinion as to what caused Dr. Neely's death, he answered: "Infection of the finger, followed by a blood stream infection."

The jury was justified in coming to the conclusion from the evidence presented to it that the insured died of blood poisoning which was caused by an infection in his right forefinger. As to the further and fundamental question of whether or not this infection of the forefinger was caused by an accident, plaintiffs had to rely upon circumstantial evidence. As to that the learned trial judge said in his charge to the jury: "The several circumstances relied upon to support the fact [in issue] cannot be presumed, but must be established by proof of the same weight and force as if each were itself the main fact in issue, which here is: 'Was there an accident?' " The court then called attention to the fact that the evidence as to the accident was largely that of Miss Hancock, the nurse who probed the puncture she saw in the doctor's right forefinger and who felt therein a movable, gritty substance. In view of the fact that a movable, gritty substance is not ordinarily found in a person's right forefinger, the jury were permitted to infer that this substance entered the finger by accidental means. In *Watkins v. Prudential Ins. Co.*, 315 Pa. 497, 173 A. 644, we said: "The operative facts of the insurance policy sued upon were 'external, violent and accidental means' causing the insured's death, and any evidence, whether direct or circumstantial, that tends to prove the operative facts, is admissible. . . . Causes of action are always set forth affirmatively and if they are to prevail they must be supported either (1) by facts

tending to prove directly the cause of action pleaded or (2) by legitimate inferences from circumstances which have met the tests of admissibility." In *Hill v. Central Accident Ins. Co.*, 209 Pa. 632, 59 A. 262, whether or not the gunshot wound which caused the death of the insured was caused by a pistol *accidentally or intentionally* discharged, was left to the jury to decide from the attendant circumstances. *Greenleaf on Evidence,* 15th edition, section 13, was quoted as follows: "In civil cases it is sufficient, if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove. . . . In both cases [civil and criminal] the verdict may well be founded on circumstances alone, and these often lead to a conclusion more satisfactory than direct evidence." In *Urian v. Equitable Life Assur. Soc.,* 310 Pa. 342, 165 A. 388, the jury were permitted to infer from circumstances whether the inhalation of the gas which caused the death of the insured was accidental or intentional. In *Pomorskie v. Prudential Life Ins. Co.,* 318 Pa. 185, 177 A. 783, an accident policy case, this court held that the issue was for the jury on evidence that the body of deceased was found with signs of head injuries apparently caused by a fall, and an autopsy revealed no indications of death from disease. In *Mars v. P. R. T. Co.,* 303 Pa. 80, 154 A. 290, we stated that where a fact is deducible as a reasonable inference from the facts and conditions directly proved, it cannot be classed as a mere conjecture or surmise or guess, and that "in both the civil and criminal law, circumstantial evidence is competent evidence." In *Com. v. Harman,* 4 Pa. 269, 273, Chief Justice GIBSON declared: "All evidence is more or less circumstantial, the difference being only in the degree." He used an illustration in which the cause of death was inferred, because, as he said, "we cannot account for the death on any other supposition." Chief Justice BIGELOW, in *Com. v. Jefferies,* 7 Allen (Mass.) 548, 563, said: "The process of ascertaining one fact from the existence of another is essential to the in-

vestigation of truth, and prevails in courts of law as well as in the ordinary affairs of life." In *Gray v. Com.,* 101 Pa. 380, in which a defendant was on trial for his life, Mr. Justice PAXSON said: "We are not jurors and are not called upon to weigh the evidence . . . further than to say . . . whether there is sufficient evidence to submit to the jury upon a particular question of fact." We also declared that absolute certainty is not required. Wigmore says in the second edition of his *Evidence,* volume 1, section 27, page 232: "The conclusions and tests of every day experience must constantly control the standards of legal logic."

Appellant in its paper book quotes from page 208 of *Thayer's Preliminary Treatise on Evidence at the Common Law,* that "the jury's verdict . . . must be defensible in point of sense; it must not be absurd or whimsical." The next sentence on the same page of Professor Thayer's book is not quoted by appellant. It reads as follows: "This, of course, is a different thing from imposing upon the jury the judge's own private standard of what is reasonable. . . . The judges are not an appellate jury." On pages 194 and 195, Thayer says in respect to inferences: "The right inference or conclusion, in point of fact, is itself matter of fact, and to be ascertained by the jury. As regards reasoning, the judges have no exclusive office; the jury also must perform it at every step. . . . Courts might always have done their own reasoning, after a fashion, if they had been in possession of a full supply of primary fact; but they were not; and when once juries were called in, at no period of their history could they discharge their special function of ascertaining and reporting facts, without going through a process of reasoning."

Defendant contends that although the injury to the finger may have been accidental, the probing of the wound by Dr. Neely was an intentional and injurious act. The answer is that if an accident to the finger started the sequence of events which terminated fatally,

the company would be liable under these policies even though the treatment invited by the trauma contributed to the fatal result. If the insured met with an accident to his finger, the probing of the wound, done admittedly by him, was a natural and probable result, and this probing though a *concurring* cause of death, would not bar plaintiffs' recovery, for the accident was the *proximate* cause. In *Jones v. Com. Casualty Co.*, 255 Pa. 566, 571, 100 A. 450, the insured's death through *accidental means* was the fact in issue, and this court held that though peritonitis was the immediate cause of death and this was due to an operation, "the operation was made necessary by the injury, and defendant cannot escape liability so long as the operation was skillfully performed, as to which no question was raised." In 1 *C. J.*, section 180, page 470, the following is given as a definition of "proximate cause" as applied to accident policies, "that cause which directly produces the effect, as distinguished from the remote cause, the cause which sets in motion a train of events which brings about a result without the intervention of any force operating and working actively from a new and independent source." In *Continental Casualty Co. v. Colvin*, 77 Kan. 561, 95 Pac. 565, it was held that the requirement of an accident policy that death must have resulted "necessarily and solely" from accidental injury is satisfied where the injury was the predominating and efficient cause of the death, and that other conditions were set in motion by the injury which may have contributed to the death is immaterial." In *Gardner v. United Surety Co.*, 110 Minn. 291, 125 N. W. 264, 26 L. R. A. (N. S). 1004, it was held that when an injury is caused by means insured against, and medical treatment administered is rendered necessary by the nature of the injury, the death of the insured, if caused by the injury and the medical treatment, was accidental, within a policy insuring against death caused by "external, violent and accidental means." In *Isitt et al., Exrs., v. The Railway Passengers Assurance Co.* (1889), 22

Queen's Bench Division 504, the question was whether or not the deceased had died from the effects of an injury caused by accident. The assured had fallen down and dislocated his shoulder. He was taken home and put to bed, where he died twenty-one days later from pneumonia. The court held: "The deceased would not have died as and when he did if it had not been for the accident. . . . He was reduced by the accident to a state of debility in which he was more susceptible of cold than he would have been but for the accident, and was also less able to resist the effects of any illness which might come to him. . . . These facts constitute a chain of circumstances leading naturally from the injury to the death. . . . The circumstances leading up to the death, including the cold which caused pneumonia, were the reasonable and natural consequences of the injury." In *French v. New York Fidelity, etc., Co.,* 135 Wis. 259, 115 N. W. 869, it was held that where death results from disease which follows as a natural, although not as a necessary, consequence of an accidental physical injury, the death is within the terms of an accident policy insuring one against bodily injuries sustained through external means, independently of all other causes, the death being the proximate result of the injury, and not of the disease as an independent cause.

In the argument of appellant's counsel, the greatest stress is placed upon the proposition that "inferences cannot be based upon inferences." In another part of their paper book they express what they consider to be the identical proposition by saying that "presumptions cannot be based upon presumptions." While counsel treat these two quoted statements as meaning precisely the same thing, they are in fact two distinct propositions, respectively untenable and sound. As we pointed out in *Watkins v. Prudential Ins. Co.* (supra), there is "a welter of loose language concerning presumptions." We there attempted to make plain the distinction between a presumption and an inference. We said: "Pre-

sumptions are not evidence and should not be substituted for evidence. . . . Presumptions are not fact suppliers; they are guide posts indicating whence proof must come." We quoted from Professor Thayer in his *Storrs Lectures* in 1896, as follows: "A presumption itself contributes no evidence and has no probative quality. It is an instrument of proof in the sense that it determines from whom evidence shall come. . . . The moment these conceptions give way to the perfectly distinct notion of evidence proper—i. e., probative matter, which may be a basis of inference, something capable of being weighed in the scales of reason and compared and estimated with other matter of the probative sort—so that we get to treating the presumption of innocence or any other presumption, as being evidence in this its true sense, then we have wandered into the region of shadows and phantoms." *Wigmore on Evidence,* 2d edition, volume 5, section 2491 (also cited by us in the *Watkins* case), says: "The distinction between presumptions 'of law' and presumptions 'of fact' is in truth the difference between things that are in reality presumptions and things that are not presumptions at all. . . . The presumption is not the fact itself, nor the inference itself, but the legal consequence attached to it. . . . A 'presumption of fact,' in the loose sense, is merely an improper term for the rational potency, or probative value, of the evidentiary fact, regarded as not having this necessary legal consequence. . . . There is but one kind of presumption, and the term 'presumption of fact' should be discarded as useless and confusing."

With the distinction clearly in mind between presumptions and inferences it is obvious that no presumption can be founded on a presumption; and it is equally obvious that inferences may be founded on inferences, as they are in the investigations carried on by scientific men and in the every day affairs of life. As to the proposition that inferences cannot be based on inferences, *Wigmore on Evidence,* 2d edition, volume 1, section 41,

says: "There is no such rule; nor can be. If there were, hardly a single trial could be adequately prosecuted. For example, on a charge of murder, the defendant's gun is found discharged; from this we infer that he discharged it; and from this we infer that it was his bullet which struck and killed the deceased. Or, the defendant is shown to have been sharpening a knife; from this we argue that he had a design to use it upon the deceased; and from this we argue that the fatal stab was the result of this design. In these and innumerable daily instances we build up inference upon inference, and yet no court ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials, proceed upon such data. The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon." Dean William Trickett in an article published in "The Forum" of the Dickinson School of Law, for March, 1906, volume 10, page 123, characterizes the postulate that "when facts are to be inferred from other facts the latter must be established by direct evidence," as "error," and suggests that as a doctrine occasionally recognized as a principle of proof it ought to be "extirpated."

Both in the activities of laymen and in the administration of justice there are many examples of the permissible drawing of more than one inference from a primary established fact.* When jurors in their delibera-

---

* The writer of this opinion cites the recently tried case of *State of New Jersey v. Bruno Hauptmann*, 180 A. 809, as affording what he believes are three excellent examples of a jury's drawing, respectively, successive inferences leading to an ultimate conclusion, from three distinct primary facts, the latter being as follows: (1) the fact that a large portion of the "ransom notes" which had been paid by the child's father for the return of his kidnapped son, were found cached in defendant's garage; (2) the fact that the handwriting in the ransom notes closely resembled the admitted handwriting of the defendant; (3) the fact that some of the wood used

tions arrive by a process of reasoning at an acceptable inference of fact, they have a right to add such fact to any previous facts found by them and proceed by ratiocination from such fact or facts to additional inferences of fact and then proceed still further by like process until they arrive at the ultimate conclusion on the issue trying.

In the instant case, the jury, starting with the primary fact testified to, namely, that a "foreign substance" was located in the insured's right forefinger on August 20, 1932, had a right to infer that this substance got in there accidentally, that it or the probe inserted therein as part of a treatment reasonably necessitated by its troublesome presence, caused an infection, that this infection reached the blood stream and caused septicemia, and that this led directly to the insured's death. This was

---

in the construction of the ladder found on the night of the kidnapping, leaning against the window of the nursery from which the child had been kidnapped, corresponded in shape and texture with wood found in the defendant's home. From primary fact "(3)," for example, the following four facts, as successive inferences from the primary fact, were drawn: (a) the ladder was in part constructed of wood belonging to or accessible to the defendant; (b) the man who had access to that wood constructed or caused to be constructed that ladder; (c) the constructor of that ladder took it to the Lindbergh home and used it to enter the window of the nursery where the child slept; (d) the man who entered the window from that ladder kidnapped the child. From these four inferences drawn successively from primary fact "(3)," plus the additional fact that the body of the child was later found bearing evidence of violent death, the jury inferred that the defendant was the child's murderer. Likewise, from primary fact "(1)" and primary fact "(2)," respectively, successive inferences were drawn, leading to the same ultimate conclusion as to defendant's guilt of the crime charged. The opinion filed in that case by Mr. Justice PARKER, speaking for the Court of Errors and Appeals of New Jersey, contains the following statement: "From three different and, in the main, unrelated sources, the proofs point unerringly to guilt, viz.: (a) possession and use of the ransom money; (b) the handwriting of the ransom notes; and (c) the wood used in the construction of the ladder."

all a legally permissible process of reasoning leading directly to the conclusion which found formal expression in the verdict.

The judgments are affirmed.