Liguori, Admr., *v.* Philadelphia, Appellant.

Argued Dec. 7, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*I. Jerome Stern,* with him *John J. K. Caskie,* Assistant City Solicitors, and *Frank F. Truscott,* City Solicitor, for appellant.

*Robert M. Bernstein,* with him *Thomas C. DiNardo* and *Milford J. Meyer,* for appellees.

OPINION BY MR. JUSTICE HORACE STERN, March 21, 1945:

The City of Philadelphia maintains for the use of the public a large bathing lake in League Island Park. In the northwesternmost portion of this lake the water runs through a channel about 55 feet wide to a concrete perpendicular intake pipe or well which is situated midway between the north and south sides of the channel

and is covered with a wooden platform approximately 12 feet long in an easterly and westerly direction and 7 feet wide; the top of this platform is 8 inches above the water line during the bathing season. Extending from the intake pipe to a pump house on the north shore of the channel there is an iron pipe 13 inches in diameter and 22 inches below the surface of the water at the platform but rising gradually toward the shore where it is only about 12 inches below the surface. The depth of the water, during the bathing season, is 3 feet 7 inches at the platform and progressively less from there to the shore.

During the summer months great numbers of young people used the lake for purposes of wading, bathing and swimming, and many of them were in the habit of diving from the platform into the waters of the channel. The lifeguards and park guards who were stationed there attempted constantly to prevent this practice but to no avail, and although the City sought to maintain "danger" signs on the platform these would usually be torn away by the children; there were no such signs there at the time of the occurrence of the accident which is the subject of the present litigation.

On July 28, 1943, in the early evening while it was still daylight, Mario Liguori, a lad slightly under 15 years of age, was bathing and swimming in the lake and, together with other boys, diving from the platform. He finally made a dive in the direction of the pump house and, in so doing, struck his head with violence against some hard object and sustained an instantaneous fracture of the fifth and sixth cervical vertebrae with an impingement upon the spinal cord which caused a complete paralysis of the lower portion of his body and to a large extent of his arms. He lingered for several months and died February 19, 1944, from the injuries sustained in the accident.

The present suit was brought during Mario's lifetime by a guardian on his behalf and by his parents in their

own right; after his death an administrator of his estate was substituted in place of the guardian. The case was tried by agreement before Judge FRANK SMITH without a jury and he found in favor of plaintiffs, awarding to the parents the sum of $2,860 and to the administrator the sum of $12,500. At the hearing considerable testimony was taken as to the manner in which the City policed the bathing beach, its maintenance of warning signs, and its failure to rope off the portion of the channel where the submerged pipe lay in order to prevent bathers, and especially divers, unaware of its existence, from coming into contact with it. The trial judge made findings concerning these matters and concluded, in general, that the City had not taken adequate measures under the circumstances to prevent such accidents and that it was guilty of negligence in the management and control of its park property at or about the platform in the lake. The City, in this appeal, does not contest these findings, and concedes that it must, for present purposes, be deemed guilty of negligence.

The real question in the case is whether the accident was the result of such negligence, or, more specifically, whether the evidence sufficiently proved that Mario, in diving into the lake, struck his head against the pipe. The bottom of the lake at that point was concrete, which, in part, was rough and broken, so that there were two possibilities as to the cause of the accident, the one that Mario struck the pipe, the other that he struck the concrete bottom of the lake. The trial judge found as a fact that "As a result of this [Mario's] dive his head came into contact with the said 13 inch iron pipe under the water of the lake and as a result thereof he sustained . . ." his injuries. The question is whether there was enough evidence to justify that finding.

There are certain general principles for guidance in solving the problem here presented, but, as so often happens, the difficulty is in their application to the particular case. On the one hand we are admonished that it is

not sufficient for a plaintiff merely to establish the alleged negligence; he must prove that that negligence was the cause of his injuries.[1] Nor is it enough to show that the accident may have been due to one or more causes for only one of which the defendant would be responsible; he must individuate as the cause the one for which the defendant would be liable.[2] On the other hand, it is equally well settled that, since proof to a degree of absolute certainty is rarely attainable in any litigated factual controversy, the law requires only that the evidence as to the operative cause of the accident be enough to satisfy reasonable and well-balanced minds that it was the one on which the plaintiff relies.[3]

The testimony in the present case to support the conclusion that Mario came into contact with the pipe was that given by two of plaintiffs' and two of defendant's witnesses. Richmond Bee testified that he saw Mario taking several dives, which he described as shallow-water dives, or flat dives; Mario "jumped on his stomach . . . he hit the water to make a speedy getaway." He said that Mario's last dive was toward the north, that "he took a shallow dive. . . . His body stopped short. I

---

[1] *Reddington v. City of Philadelphia,* 253 Pa. 390, 98 A. 601; *Stern v. Reading,* 255 Pa. 96, 99 A. 367; *Erbe v. Philadelphia Rapid Transit Co.,* 256 Pa. 567, 100 A. 966.

[2] *Bruggeman v. City of York,* 254 Pa. 430, 98 A. 970; *Flanigan v. McLean,* 267 Pa. 553, 110 A. 370; *Gausman v. Pearson Co.,* 284 Pa. 348, 131 A. 247; *Long v. Frock,* 304 Pa. 355, 156 A. 88; *Pfendler v. Speer,* 323 Pa. 443, 185 A. 618; *Fix v. Pennsylvania Power & Light Co.,* 346 Pa. 598, 31 A. 2d 114.

[3] *Tucker v. Pittsburgh, Cincinnati, Chicago & St. Louis Rwy. Co.,* 227 Pa. 66, 75 A. 991; *Ferry v. Philadelphia Rapid Transit Co.,* 232 Pa. 403, 81 A. 426; *Kapuscianski v. Philadelphia & Reading Coal & Iron Co.,* 289 Pa. 388, 137 A. 619; *Strobel v. Park,* 292 Pa. 200, 140 A. 877; *Mars v. Philadelphia Rapid Transit Co.,* 303 Pa. 80, 154 A. 290; *Mull v. Bothwell,* 338 Pa. 233, 12 A. 2d 561; *Giordano v. Clement Martin, Inc.,* 347 Pa. 61, 31 A. 2d 504; *Rowles v. Evanuik,* 350 Pa. 64, 38 A. 2d 255.

watched him—I turned away a minute, and I looked back, and he was still lying there." Questioned how far Mario's body went down in the water before it stopped, the witness answered, "Well, I would say about a foot and a half to two feet, then it stopped short. Q. When it stopped short, what position was the boy in? A. He was lying like he was bent there. Q. What was he lying on? A. He was lying on the pipe—which I later found out." The witness said that he turned away, his attention was attracted elsewhere, and when he looked back Mario "was still in that position on the pipe." His testimony proceeds: "Q. How long after he dived in and he was lying there, did you go out to rescue him? A. I would say he was down about a half minute to a minute. . . . Q. When did you first discover there was a pipe there? A. When I went out there to pick up the boy, my leg bumped against it, and when I went to pick the boy up my arm encircled the pipe. Q. Was he above the pipe? A. Yes. Q. Was any part of his body emerging from the water? A. His head was sideways. Q. What was the position of his legs? A. His feet were dangling over the pipe. Q. Will you tell us where his left foot and right foot were, if you know? A. The pipe was running north to south—his head was facing north, with his right arm and right leg on the west side of the pipe, and his left arm and left leg were on the east side of the pipe, with his face north." In response to the question: "At the time this accident happened, about how far below the top of the water was this boy? he answered: "I would say between a foot and a half to two feet." He further explained that he "watched him dive into the water. His body stopped, and as he stopped, a girl hollered, around the lifeguard stand, and my attention was called away for that second, and then I looked again and I saw Mario straddling on the pipe." Mario said, when he was lifted out of the water and placed on the shore, "What did I hit? Why can't I feel nothing in my body?"

George Schaefer testified that he witnessed the happening of the accident, that Mario took a shallow, standing dive and stopped suddenly, that the top of his leg projected and his hair floated up out of the water. Asked, "About how far down did he go before the body stopped," his answer was: "I imagine about a foot—not quite." He saw Bee take Mario off the pipe.

Orlando Rota, one of the lifeguards, a witness called by defendant, testified that Mario, when picked up, was lying about 5 or 6 feet from the platform, indicating that he had not dived far forward.

Elizabeth Ginder, another witness for defendant, said that Mario was picked up right by the platform. She saw him dive, and to the question in cross-examination: "Did this boy dive right over the point where the pipe was located?" she answered: "Yes, he did."

In our opinion the testimony thus recited was sufficient to justify the fact-finding tribunal in concluding that Mario had come into contact, not with the concrete bottom of the lake, but with the pipe. In the first place, he dived from the platform right over the location of the pipe. In the second place, he took a standing, shallow dive, hitting the water on his stomach not far out from the platform and where the water was at least 3 feet deep. In the third place, he stopped suddenly at a depth of only a foot, as Schaefer said, or a foot and a half to two feet, as Bee testified. At that point the pipe was about a foot and a half below the surface of the water. In the fourth place, it was from the pipe that he was lifted; from the nature of his injury and the mere instant of time that elapsed between his diving and his being seen on the pipe it would seem scarcely possible that, if he had struck the bottom of the lake, he could have come up and either lifted himself onto the pipe or floated upon it so as to be straddling it. It is not necessary, as the cases which have been cited indicate, that an eye-witness be produced who actually saw Mario's head come into contact with the pipe; the fact that this

is what occurred may be inferred from the circumstances if indicated by the fair weight of the evidence.

The trial judge found that Mario was not guilty of contributory negligence. Because of the coloring of the water, due to chlorination, the pipe could not be seen unless one were to bend directly over it and look for it. There was evidence that, a year before, Mario had been in the lake in the vicinity of the platform and on that occasion had played around and even walked on the pipe, but, as the trial judge said, even if this were true, Mario, a year later, might well have forgotten the presence of the pipe under the water. He was not charged with the duty of retaining the fact in his memory; (cf. *Burchfield v. Borough of Conneaut Lake,* 114 Pa. Superior Ct. 114, 117, 174 A. 668, 669). As already stated, it was testified that there were no warning signs about the platform when the accident happened, and the trial judge found that there was no satisfactory evidence to show that Mario was then aware of the existence of the pipe or to rebut the presumption that he was using due care. He was held only to such measure of discretion as is usual in those of his age and experience, and there was apparently nothing dangerous, as far as any submerged object was concerned, in diving as he did from the platform and as a great number of other lads were doing at the same time.

The City challenges the amount of the verdicts rendered. As far as the award in favor of the parents is concerned, the hospital and medical expenses amounted to approximately $400, so that $2,460 is to be attributed to the present worth of Mario's probable earnings, less his cost of maintenance, for the period between the time of the accident and his majority. The evidence indicates that he would no doubt have continued his schooling until he had completed his senior high school course, which would have made him eighteen years of age before he graduated, but for several years he had been working after school hours and during the summer vacations and

thus earning a few dollars a week. It cannot be said that in the succeeding three years he would not likely have earned $2,460 in excess of the cost of his living. Even where a minor child was only six years of age when killed, so that there would have ensued a long period of years during which it would have had to be supported and would have earned nothing, a verdict was sustained to the extent of $3,500 in *Walker v. Perkins,* 319 Pa. 469, 181 A. 511; and in the case of another child three years and nine months old a verdict was approved to the extent of $3,000: *Altenbach v. Lehigh Valley R. R. Co.,* 349 Pa. 272, 37 A. 2d 429.

As to the verdict in favor of the administrator of Mario's estate, there were two items of recovery permissible, one for his pain and suffering and the other for the loss of his earning capacity. During the period between the time of the accident and his death, a matter of seven months, his condition can be conservatively described as dreadful. Quoting from the findings of the trial judge: "While in the Methodist Hospital, the said minor was conscious and there was no impairment of his mental processes. He was aware of his inability to move his arms and legs. His bladder and bowels were also paralyzed and he had no control over their actions. It became necessary to open his bladder through his abdomen so that he could pass urine and a tube was inserted in the said opening. He developed several pressure or bed sores due to the inability of moving him about. He also, while in the hospital, developed an infection of his bladder. . . . Due to his inability to control his bowels and kidneys, it was necessary to change his bed linen on many occasions. One doctor testified that he was constantly in a flood of urine. He there suffered continuous pain, suffering and inconvenience and on February 19, 1944, died as a result of the kidney infection which was directly related to the injuries sustained by him in the accident." Of course his earning capacity was completely destroyed by his

death, and while there is no evidence in the record of his life expectancy it must have been a long one in the case of a 15 year old boy described as being between 5 feet 5 and 5 feet 7 inches tall, strong, sturdy, athletic and vigorous and weighing 150 to 160 pounds. Under such circumstances, considering both items upon which the award of $12,500 was based,—his pain and suffering and the economic value of his life calculated according to legal rules,—we cannot say that the amount allowed by the experienced judge who tried the case was excessive.

Judgment affirmed.