Pinkshaw *v.* Cambria Township, Appellant.

Argued November 14, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*A. A. McDonald,* with him *Myers & McDonald,* for appellant.

*C. E. Davis,* for appellee.

OPINION BY DITHRICH, J., January 17, 1952:

Plaintiff, Henry Pinkshaw, is the owner of a tract of land embracing about 180 acres in defendant Township of Cambria. For a considerable distance this tract abuts on a Township road, constituting its northerly and northwesterly boundaries, and is situated in a valley into which surface waters from lands north of the Township road and the road itself naturally drain. A small stream, after passing through a culvert under the Township road, enters plaintiff's land at its northeasterly corner and crosses it in a southwesterly direction. However, this culvert is blocked most of the time and during heavy rains surface water overflows onto the road and thence onto plaintiff's property.

Beginning in 1938, plaintiff constructed six dams on the land in question for purposes of "raising, propagating, and stocking fish," incidents of his commercial fishing venture. Five dams were constructed west of the stream, creating small ponds, fed by springs, which were used as "rearing pools." The sixth and largest one was constructed on the southerly portion of plaintiff's land. The pond there created, fed principally by the stream and surface drainage, covered five or six acres and was five to six feet deep. When fish in the "rearing pools" reached a certain size they were transferred to the pond at the large dam where the public, upon payment of a fee to plaintiff, were permitted to fish.

In the fall of 1943, in improving the Township road, defendant covered it with coal mine waste to a depth of four to eight inches. Following heavy rains in the spring of 1944 large numbers of plaintiff's fish died,

though prior to that time they had thrived in the environment provided for them. On May 24, 1945, plaintiff filed an action in trespass against defendant seeking to recover damages for injury to his real estate, alleging that "the dams and/or ponds constructed by the Plaintiff . . . became useless for the purpose of raising, propagating, and stocking fish caused by water passing through the . . . coal mine waste . . ., whereby the waters in the dams and/or ponds became toxic to fish, the . . . substance negligently . . . placed on the . . . road . . . causing sulphur compounds and acids in the water of said dams and/or ponds."

The case was first tried in 1947 and resulted in a verdict for plaintiff for $6800, but a new trial was granted on the ground that the verdict was excessive. A second trial took place in 1949 and resulted in a verdict for plaintiff for $1500. The court below denied defendant's motions for new trial and judgment n.o.v. and ordered judgment entered on the verdict. The sole question raised in this appeal is whether plaintiff has proved, with the certainty required by law, a causal connection between defendant's negligent use of the coal mine waste on the Township road and the injury to plaintiff's land.

It is clearly established that the mine waste generated a toxic substance which was deleterious to aquatic life. There was expert testimony that aquatic life will not live in water having a pH less than 4.6. The symbol pH, as used here, refers to acid content. Samples taken from the roadbed in 1944 showed a pH of 2.4 and a pH of 2.6. In 1949 similar samples indicated a pH of 2.9 while samples of drainage water on and at the side of the road produced pH readings of 3.7, 3.9 and 4.2.

The record also discloses that every time it rained, mine waste from the road washed onto plaintiff's land

and tons of it have settled along the stream that feeds the large dam. There is testimony that no vegetation grew along the banks of the stream over a space extending ten or twelve feet back on either side of it and continuing for a distance of 200 or 300 feet from the Township road. It appears that a ditch leading from the road and near two of the smaller ponds would overflow following heavy rains. When it did so fingerlings, with which the ponds had been stocked, died. Though plaintiff drained and restocked the ponds, when the ditch subsequently overflowed, fish again died. This occurred three times between 1944 and 1949.

Plaintiff's witness, W. C. Moss, who had 44 years' experience with fish hatcheries, stated in response to a hypothetical question that the death of the fish was caused by the content of the coal waste placed on the road. Defendant's witness, Dr. Henry Idzkowsky, a biologist, was asked the following question on cross-examination: ". . . Assuming that refuse from coal mines containing sulphuric acid [was] placed on the highway to a thickness of four to eight inches in the fall of 1943, and it was disclosed that that substance was washed into water containing fish, and fish to large numbers were found dead in that body of water in the spring of 1944, what, in your opinion, in the absence of any explanation as to what caused the death of those fish, actually caused their death?" He answered: ". . . Excluding all other factors, which . . . is very unscientific, it would have to be that one cause. You are limiting it to that one factor."

Since plaintiff made no attempt to prove by scientific or other direct proof that the toxic substances contained in the coal mine waste were present in the waters of the dams, or that those waters were toxic to animal life, defendant contends that he failed to prove a causal connection between defendant's negligent act and the injury complained of. In support of

this contention defendant relies principally on the case of *Waldron v. Metropolitan Life Ins. Co.*, 347 Pa. 257, 262, 31 A. 2d 902, wherein it is stated: " 'The courts have always insisted that the life, liberty and property of a citizen should not be taken away on possibilities, conjectures, or even, generally speaking, a bare probability. . . . . When an inference of the probability of the ultimate fact must be drawn from fact whose existence is itself based only on an inference or a chain of inferences . . . all prior links in the chain of inferences must be shown with the same certainty as is required in criminal cases in order to support a final inference of the probability of the ultimate fact in issue. . . . . The prior inferences must be established to the exclusion of any other reasonable theory rather than merely by a probability.' " See also *Henderson v. National Drug Company*, 343 Pa. 601, 607, 23 A. 2d 743.

It is true that the probability of the ultimate fact in issue in this case "must be drawn from fact whose existence is itself based only on an inference or a chain of inferences." But we do not believe that it was necessary for plaintiff to prove by scientific analysis, by other direct evidence or by inference—before the probability of the ultimate fact could be legitimately inferred—that the waters in which the fish died were deleterious to the fish after the *complete* dilution of the toxic substances with those waters. The degree of acid content in the waters after *complete* dilution being therefore immaterial, the evidential requirements stated in the *Waldron* case, quoted supra, insofar as they relate to that fact, are also immaterial.

In our opinion the essential facts in this case are: (1) the coal mine waste on the road generated toxic substances; (2) these substances were carried by the natural flow of surface waters onto plaintiff's land and into the ponds located thereon; (3) when they

passed into the ponds they were deleterious to the fish; (4) when the fish came into contact with these substances they died; (5) the fish died in great quantities subsequent to the covering of the road with coal mine waste in 1943, and not before.

It is not necessary to prove legal causation by direct evidence; it is sufficient if the testimony supports inferences which may reasonably be drawn by the jury. *Loney v. Denenberg,* 166 Pa. Superior Ct. 378, 382, 71 A. 2d 842. Cf. *Foley v. The Pittsburgh-Des Moines Co.,* 363 Pa. 1, 20, 68 A. 2d 517. "[S]ince proof to a degree of absolute certainty is rarely attainable in any litigated factual controversy, the law requires only that the evidence as to the operative cause of the [injury] be enough to satisfy reasonable and well-balanced minds that it was the one on which the plaintiff relies": *Liguori v. Philadelphia,* 351 Pa. 494, 498, 41 A. 2d 563. See also *Straight v. B. F. Goodrich Co.,* 354 Pa. 391, 47 A. 2d 605. Nor does the law require the elimination of every *possible* cause other than that on which plaintiff relies, but only such other causes, if any, as fairly arise from the evidence. *Foley v. The Pittsburgh-Des Moines Co.,* supra, p. 25, and cases there cited.

We have viewed the evidence in the light most favorable to plaintiff in view of the verdict (*DiGregorio v. Skinner (No. 1),* 351 Pa. 441, 41 A. 2d 649) and are of opinion that all prior inferences—leading to facts proved by inference alone and essential to the final inference of causal connection—were established "to the exclusion of any other reasonable theory" and that there was sufficient evidence "to satisfy reasonable and well-balanced minds" that defendant's negligent act was the cause of the injury to plaintiff's real estate. No other cause fairly arises from the evidence.

Judgment affirmed.