Cantwell, Appellant, *v.* Bristol Township.

Argued January 18, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Tyson W. Coughlin,* with him *Hamilton C. Connor, Jr., Robert Baker,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellant.

*George T. Kelton,* with him *Begley, Carlin, Mandio, Kelton & Popkin,* for appellee.

OPINION PER CURIAM, November 12, 1963:
Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Joseph Francis Cantwell, 23 years of age, healthy, strong, married, gainfully employed, and with a horizon of life's happiness unmarred by a single cloud, went swimming in the summer of 1958 in the Lagenfelder Lake in Bristol Township, Bristol County. This aquatic excursion ended in his being paralyzed for life.

As he dived into the water, his head struck a rigid object of unknown character and, in consequence, he suffered what is referred to in popular language as a "broken neck." The doctor who examined him testified that Cantwell suffered a dislocation of the sixth vertebra, causing a complete paralysis below that vertebra.

Cantwell brought suit against the Township of Bristol, averring that the township had been negligent in its maintenance of the recreational lake which measured about 700 feet by 250 feet. At the trial, the court entered a compulsory nonsuit.

There was evidence that the township, in preparing the lake for the swimming public, had drained it, cleared it of obstructions and then covered the bottom with a six-inch layer of sand. When water refilled the lake, loiterers and strollers began to toss, roll, throw, push, and otherwise introduce into the lake, truck tires, steel drums, planks and other foreign objects which could impede swimming and endanger the safety of the swimmers. The township could not help but know of this malicious mischief.

For reasons not made clear at the trial the township removed strange objects from the south end of the lake but ignored conditions in the northern part of the lake. Fate would have it that Cantwell was to swim in these northern waters which had become a submarine junk yard. He had arrived at the lake on the evening of July 15, 1958, at about 6:30 p.m., with his brother-in-law, Robert Downs. After they had en-

gaged in some competitive swimming, they decided to see who was the better underwater swimmer. Downs, who was a youth of 18 or 19, ran and dived into the lake from the northern shore. Cantwell waded to a point where he stood in water about 3½ feet deep and then performed a shallow dive. He did not surface again.

Downs hurried to him and discovered that Cantwell's back and the rear part of his head were floating below the outer level of the water and his arms and legs were in a "jackknife position." He got the disabled swimmer to shore as soon as possible and a policeman summoned an ambulance.

The lower court, in entering the nonsuit, said that the plaintiff's case failed because "there was a complete absence of proof of causation." The "causation" of the accident should be plain to anyone who runs or swims. It was the failure of the township to prohibit the casting of debris into the lake, the failure to clean out the lake, and the failure to warn swimmers of the presence of rubbish and wreckage in the lake.

The court argued that even if it could be assumed that the township had been negligent in the matters just mentioned, the plaintiff did not prove that he was injured because of any contact with any of the foreign articles described. An injured person seeking recovery for damages tortiously inflicted cannot be expected to produce what it is beyond his physical capacity to obtain. The water in the area of the accident was opaque; the swimmer could not see the lake's bottom. And, once Cantwell was injured he certainly could not investigate to see what his head had struck, nor did his brother-in-law have time to probe the aqueous vicinity. It was imperative he get his unconscious brother-in-law to shore at once.

However, what was not visible because of the opacity of the water and the emergency of the situation,

easily swam into view through the periscope of elementary analysis and logic. Since Cantwell did not dive from an elevated level, and since the water at the crucial point was only 3½ feet deep, it is a matter of elementary physics and mechanics that he could not possibly have developed such a momentum in that short dive to break his neck by coming into contact with sand. There was evidence that the plaintiff's head acquired a bump about half the size of an egg. It is inconceivable that a protuberance of such dimensions could have developed from an encounter between a bony skull and soft sand. Thus there can be no natural explanation for the bump, as well as the broken vertebra, except that there had been a violent contact between the bony skull and a rigid, unyielding obstacle. That being so, the next query is: What could that rigid obstacle be? A jury could well have concluded from the evidence that the rigid object *had* to be one of those chunky unbuoyant articles thrown into the lake at that point.

Let us suppose that there had been evidence that broken bottles had been thrown into the water prior to the accident and that Cantwell's head was bleeding when he was removed from the water. In such a situation I doubt that it could be argued that there was no "causation". Even though no one would have testified that bottles were seen on the floor of the lake, a jury would be justified in concluding that the head wounds were caused by the broken bottles. The law in such a situation would not even require that the plaintiff's case exclude all other hypotheses as explanation for the cutting. Since there *was* evidence that there had been thrown into the lake at this point, objects which could cause the injuries described, how does the present case differ from the broken bottle case?

As was well said by Justice McBride in the case of *Smith v. Bell Telephone Co.*, 397 Pa. 134: "A plaintiff

is entitled to have his case considered by the jury even though he does not show that the *only* reasonable inference is that defendant's negligence was the proximate cause of the accident. It is enough that he produces evidence which may properly be found by the jury to justify an inference that the defendant's negligence was the proximate cause of the accident because such evidence outweighs even though it does not *exclude* an inference that the defendant was not negligent or that his negligence was not the proximate cause of the accident." (Emphasis supplied).

In *Gash v. Lautsenhezer*, 405 Pa. 312, we said further: "The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant."

Can it be reasonably said that it would be unreasonable to conclude that the defendant was guilty of negligence in the case which is the object of this appeal? In the absence of any suggestion that the lake harbored sharks or other man-attacking sea monsters, how can the injury to the plaintiff's head be rationalized except by the most natural conclusion that it came into contact with something that had no place in a swimming lake?

The plaintiff here does not ask for an award of money at our hands, he only asks that a jury be allowed to pass factually on what is strictly a factual matter. In *Liguori v. Philadelphia*, 351 Pa. 494, the plaintiff's decedent, a 15-year-old boy, dived into a swimming lake maintained by the City of Philadelphia. His head struck something unyielding, paralysis followed, and then the boy died as a result of his injuries. The question at the trial was whether his head struck a pipe in the water or struck the cement bottom of the lake. In that case there was actual proof of the existence of a pipe. Even so, there was no direct testimony that the

lad encountered the pipe at the moment his body entered the lake. The jury returned a verdict for the plaintiff. This Court sustained the verdict, Justice (later Chief Justice) STERN saying: "The real question in the case is whether the . . . evidence sufficiently proved that Mario, in diving into the lake, struck his head against the pipe. The bottom of the lake at that point was concrete, which, in part, was rough and broken, so that there were two possibilities as to the cause of the accident . . . There are certain general principles for guidance in solving the problem here presented, but, as so often happens, the difficulty is in their application to the particular case. On the one hand we are admonished that it is not sufficient for a plaintiff merely to establish the alleged negligence; he must prove that that negligence was the cause of his injuries . . . On the other hand, it is equally well settled that, *since proof to a degree of absolute certainty is rarely attainable in any litigated factual controversy, the law requires only that the evidence as to the operative cause of the accident be enough to satisfy reasonable and well-balanced minds that it was the one on which the plaintiff relies* . . . It is not necessary, as the cases which have been cited indicate, that an eyewitness be produced who actually saw Mario's head come into contact with the pipe; the fact that this is what occurred may be inferred from the circumstances if indicated by the fair weight of the evidence." (Emphasis supplied).

The lower court in the case at bar conjured up a problem which it thought insoluble when it said that "no presumption can be drawn from a presumption." Of course, the existence of such a rule is unquestioned and its salubrity should be undebatable—when circumstances dictate its applicability. But rules, like the strongest trees, must bend before the high wind of necessity, if they are not to break and render the forest of logic and justice a chaos of fallen giants.

In *Fanning v. Equitable Life Assurance Society*, 264 Pa. 333, suit was entered on a death insurance policy, based upon the assertion that the insured had perished in a forest fire. There was no proof that he actually died in a forest fire, none even that he actually went into the fire. No trace of his body or of clothing was found in the area which the forest fire had razed. There was only evidence that he had told someone he was "going to fight the fire." That was all. He was never seen or heard from again. The insurance company argued that "since there is no positive evidence that Thomas Fanning actually went to the forest fire in 1908, a finding that he then died as a result thereof must be arrived at through a presumption resting upon a presumption, which the law does not permit."

We allowed recovery on the policy, Justice VON MOSCHZISKER (later Chief Justice) saying: "The finding that Fanning went into the forest fire and thereby met his death, need not be viewed as representing two distinct conclusions, one derived from the other. The one, no doubt, helps the other, but both *rest upon the strong probabilities which arise from a consideration of all the various facts and circumstances involved;* which method of reaching a determination, with its possible lack of refined reasoning, is permissible because of the necessities peculiar to this particular class of cases. The verdict rests upon the evidence as a whole, and the finding of Thomas Fanning's death in 1908 does not present an inference from an inference, but a comprehensive conclusion justified by the facts and circumstances herein previously detailed; hence appellant's attack thereon cannot be sustained." (Emphasis supplied.)

I submit that the reasoning in the *Fanning* case, which is not "refined" but wholesome and proper, could well apply to the case at bar and would allow the plaintiff the right to go to a jury "for a comprehensive conclusion justified by the facts."

The court below, in reviewing the evidence, said that it had to be reviewed "in the light most favorable to the plaintiff," but in its discussion it is evident that the court worked in a very dim light indeed. A witness, Lawrence Foerst, employed by the defendant township, testified that during the winter of 1957 and and 1958 he saw children "throw tires and wood down the bank into the water." He saw a 50-gallon drum as one of the items going into the lake. His superintendent instructed him to remove obstacles from the lake. In response to those instructions he did remove in June, 1958, a 50-gallon steel drum, two large tires, and a small tire. All this from the southern part of the lake. He removed nothing from the northern part of the lake, where the accident occurred. The court below saw nothing special in this rather vivid circumstance. In fact, it does not even mention it. I believe it is the very heart of the case. Here you have a township knowing of a dangerous condition in the lake, a danger which covers two areas: northern and southern. It removes the danger from the southern area but stays away from the leprous northern region. Why may not the jury infer from this that the accident would not have happened if the township had cleaned up the northern area, as it did the southern area?

A municipality may not, in the guise of a benevolent patriarchal father, supply its inhabitants with recreational facilities and then ignore basic cautions for their safety.

One of the gratifying phenomena of life is that the world operates in accordance with certain well-defined principles of scientific law. Cantwell's paralytic condition is the result of a physical situation. What was it? Dr. Sagen, his physician, was asked if the plaintiff's injury could "have been caused by the plaintiff bumping the top of his head on a steel drum, a water-soaked log, or a piece of wood." He replied in the affirmative.

He also said that the injury could not have happened by the plaintiff striking the bottom of the lake unless the plaintiff went into the water at an angle close to 90 degrees. *All* the evidence was that the plaintiff entered the water in a *shallow* dive, one in which the angle could not have exceeded 30 degrees. Why ignore all these circumstances which, uncontradicted and undenied, total up to a jury question as to whether the township was or was not guilty of negligence?

The lower court did not answer that question. This Court, in affirming the lower court's decision, did not even acknowledge the question and, by that absence of acknowledgment, has failed to throw a lifeline to the good ship *Cause-and-Effect* which collided with the submerged rock of *Technical-Subserviency*. I disclaim any responsibility for the foundering of due process which followed and, therefore, dissent.