## Whigham v. Metropolitan Life Insurance Company, Appellant.

Argued October 1, 1941. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, PATTERSON and PARKER, JJ.

*D. C. Jennings,* with him *Wallace E. Edgecombe,* for appellant.

*Thomas Lewis Jones,* for appellee.

OPINION BY MR. JUSTICE MAXEY, November 24, 1941:

This is an appeal from the refusal of the court below to grant a new trial after a verdict for the plaintiff in the sum of $3,000 plus $600 interest in an action of assumpsit on a policy of life insurance. On January 1, 1936, the defendant delivered a life insurance policy to John E. Whigham, providing that in consideration of the payment of the monthly premium of $6.18 the company would pay $1,500 to the insured's wife as beneficiary upon receipt of due proof of the death of the insured and further by "supplemental contract" attached to the policy, in consideration of the payment of an additional premium of 24 cents a month the company agreed to pay to the beneficiary an additional $1500 "upon receipt of due proof of the death of the insured as the result, directly and independently of all other causes, of bodily injury sustained solely through external, violent and accidental means" and subject to certain other provisions not material to the issue now before us.

The "supplementary contract" also contained the following clause: "The insurance under this supplementary contract shall be suspended while the insured is insane, . . ." The insured died on November 20, 1937, when the policy and supplementary contract were in full force and

all premiums had been duly paid. The beneficiary claims that the insured's death was caused by external, violent and accidental means; the company claims that it was due to suicide.

On November 15, 1937, the insured was taken to "the mental department" of St. Francis Hospital in Pittsburgh. His case was diagnosed as one of involutional melancholia. For two days he was confined to his bed with anklet and belt attached so that he could not leave it but on the third day he was permitted to move about. On November 18 he was seen by one of the hospital attendants apparently going to the lavatory. A few minutes later, this attendant found him lying upon the floor of the lavatory in an unconscious condition. He was removed to his room and in a few minutes recovered consciousness. X-ray pictures revealed his fractured skull. An operation was performed but the insured died on November 20, 1937. The coroner's physician, Dr. McMeans, testified to the finding of the autopsy performed by him, including a fractured sternum and superficial abrasions of the forehead and lower lip. He testified that the injuries were the result of multiple trauma, that they could have been caused by a fall, but that in his opinion they were not so caused. Dr. McMeans detailed the injuries as follows: "In the middle of the forehead there was a transverse abrasion, superficial in character, measuring one inch by one-quarter of an inch. The abrasion was just above the area between the eyebrows, above the frontal eminence. There were three abrasions between the parietal eminences. Those are the bony prominences on either side of the head, and they ran in anterior-posterior position, that is, from the fore backward. . . . There was a vertical incision three-quarters of an inch in front of the right ear. . . . In the middle of the right lower lip, at the vermilion border, there was a superficial wound measuring one-fourth of an inch in diameter." He found a hemorrhage on the right side of the brain between the covering of the skull and the bone

itself in the region of the fracture that he found on that part of the skull, and a fracture of the upper part of the breast bone between the first and second ribs. He declared that "death was due to shock and hemorrhage following a fracture at the base of the skull and right temporal bone, with lacerations and contusion of the left temporal lobe of the brain, and there was a bilateral lobar pneumonia in the lower lobes of both lungs." He said: "I think it would take a pretty considerable force or injury to cause the fracture of the skull of the type that I have described. . . . He must have had a blow." When asked whether the condition described could have been caused by a fall, he answered: "I would be willing to say it could be caused by a fall, as I did, but the man had multiple injuries. . . . I can't say that it was a single cause. . . . Two separate forces may have come into effect as the result of the fall, or there may have been a separate force applied to the breast bone which caused him to fall and fracture his skull, because my experience is that an individual must have a fracture of his breast bone by direct force applied either in a fall or a blow directly to the breast bone. Such may have been the case here. There are those possibilities, but I feel that he fell and fractured his skull after the fracture of the breast bone had occurred. . . . I don't think he could have had a fracture of the breast bone by contact with the floor. I feel that he must have fallen across something. There was a bath tub in this room, as I understand." On being informed there was *no* bath tub in the room, the witness said: "There were objects that he could have fallen on and then fallen to the floor and fractured his skull." The witness was asked on cross-examination: "The same thing could have happened if he had dived or run into the wall and hit his breast bone on the washstand, for instance, as he did so?" He answered: "I don't know how he could. If he ran up against a flat wall, I can't conceive how he would fracture his breast bone then, any more than he would by a fall on the floor." He was asked:

"Suppose he climbed up and dived and came down and struck his breast bone on the corner of a washstand on the way down, and then he hit his head on the floor. It could have occurred that way, couldn't it?" He answered: "I don't think the man could have sustained a fracture of the skull and a fracture of the breast bone in a dive from a place such as you have indicated; . . . he also had a wound on the lower right lip . . . and there was multiple trauma. How this trauma was applied I don't know, but I don't think that it happened in any way that you have indicated, . . . I don't think it happened in a fall. I mean on account of the multiple character of the injuries. Something happened to this man; what it was I don't know; but he had multiple injuries and they didn't all come about as a result of one trauma."

The defense called as a witness a nurse at St. Francis Hospital. She testified that after Whigham was taken to his room and recovered consciousness and was asked what he did, he replied: "It was the only way out." Dr. Staley testified to the same remark made to him by the patient. Dr. Frederick, called by the defendant, testified that at the time Whigham was admitted to the hospital his condition was one of involutional melancholia, and this is "a mental illness which occurs in and about middle life, characterized chiefly by depression or sadness, in which the individual has a feeling that things are not worth living for; they are depressed and ofttimes they wish to do or make an attempt at death." He characterizes this as a form of insanity. In rebuttal, Dr. Jameson testified that involutional melancholia is *not* insanity, that it is an aggravated fit of the blues . . . "it is not insanity but it may become insanity." This physician was then informed as to the evidence in the case and was then asked whether persons so injured could think and speak clearly. The purpose of the question was obviously to weaken the force of Whigham's statement made after his injury that "it was the only way out." The witness answered: "The fact that this man suffered a fracture

of the skull and laceration of the brain with hemorrhage leads me to believe that" he "also suffered a severe concussion at the time. A patient suffering from concussion following this trauma is in a dazed condition, provided they are not unconscious. They cannot think clearly. They repeat themselves, they do not have any understanding of questions asked of them, and they are usually irrelevant and suffer this period of amnesia immediately following the effects of an injury."

The defendant asked for a new trial on, inter alia, the following reasons: (1) The verdict was contrary to the evidence. (2) The verdict was against the weight of the evidence. . . . (4) The court erred in refusing defendant's second point that the plaintiff had failed to meet the burden of proving that the death was the result of external, violent, and accidental means, independently of all other causes. (5) The court erred in not withdrawing the plaintiff's claim for death by accidental means from the Jury. The court in refusing a new trial held that the question whether death was accidental or suicidal was for the Jury and not for the court.

In *Watkins v. Prudential Ins. Co.,* 315 Pa. 497, 173 A. 644, we discussed the burden of proof which rests upon a claimant under a policy which provides for double indemnity when death results from external, violent and accidental means. In that case, in reversing the court below, we said: "On plaintiff rests the burden of proving all the operative facts by a fair preponderance of the evidence. An even balancing of the evidence on the issue of death by accidental means or death by suicide denotes that plaintiff fails to sustain her burden of proof and the verdict should be for the defendant. Causes of action are always set forth affirmatively and if they are to prevail they must be supported either (1) by facts tending to prove directly the cause of action pleaded or (2) by legitimate inferences from circumstances which have met the tests of admissibility. Mere guesses and conjectures cannot be substituted for legal proof."

We recognize the fact that an allegation of accidental death does not have to be supported by *direct* proof. Circumstantial evidence is likewise legal evidence but the circumstances attendant upon a violent death must be such as to engender in the mind such a strong belief in the probability that the death was accidentally caused as to rationally outweigh all other probabilities as to the cause of death. If the party who pleads accidental death has not produced evidence which generates in the average reasonable mind sitting in judgment on the question such a preponderating belief he has not met the burden of proof resting upon him. In *Taylor v. General Accident Assurance Corporation,* 208 Pa. 439, 57 A. 830, this court affirmed per curiam the judgment of the court below "on the opinion of the learned judge of the common pleas", Judge ENDLICH. The latter in his opinion aptly said : "The accidental character of a fall may be proved by circumstances—just as any other fact may be so proven; the test of the sufficiency of the circumstances adduced always being that, viewed as a whole, they reasonably exclude by their preponderating probative weight any other explanation founded in evidence. See *Phila. Trust, etc., Co. v. Phila., etc., R. R. Co.,* 160 Pa. 590, 594, and Wills, Circ. Evid., pp. 189-190. Nor can it be indispensable that they establish a specific one of a number of accidental causes equally reasonably suggested by the evidence. It must be enough if they fairly exclude design or disease as a cause inferable consistently with the evidence, and thus justify the conclusion that the occurrence is to be referred to the general head of accident."

In the instant case the evidence produced by the plaintiff in support of her averment of her husband's accidental death is so weak and inconclusive that no preponderating inference of accidental death can legitimately be drawn from it. The record leaves one completely in doubt as to the cause of insured's death and nowhere does mere conjecture abandon the field to legal proof.

In *De Reeder et al. v. Travelers Ins. Co.,* 329 Pa. 328, 333, 198 A. 45, in which plaintiff sought to recover on an insurance policy which provided for a certain payment upon proof of death occurring "from bodily injuries effected . . . through external, violent, and accidental means", we said: "Plaintiffs' case fell because of failure of proof. There were no facts or circumstances from which the jury could infer legitimately *to the exclusion of other inferences equally plausible* that the insured's death resulted from an accident. The burden of proof resting upon plaintiffs in civil actions cannot be met by conjectures. The phrase 'burden of proof' means exactly what it says. There is a close relationship in logic between the quality of proof required in criminal cases and that required in civil cases. The difference is in the degree of its cogency. In both classes of cases proof is required of the party on whom is the burden of establishing the truth of the basic proposition essential to recovery. Mere conjecture or guesses do not supply this proof. Circumstantial evidence is legal evidence in both classes of cases, but just as in a *criminal* case 'the evidence of facts and circumstances must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed' (*Com. v. Benz,* 318 Pa. 465, 472, 178 A. 390), so in a *civil* case the evidence of facts and circumstances on which plaintiff relies and the inferences logically deducible therefrom, must so preponderate in favor of the basic proposition he is seeking to establish as to exclude any equally well supported belief in any inconsistent proposition."

The judgment is reduced to $1800 and as modified is affirmed.