Henderson *v.* National Drug Company et al., Appellants.

Argued December 4, 1941. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Michael A. Foley,* with him *Henry I. Coplin,* for appellant No. 302.

*Philip H. Strubing,* for appellant No. 309.

*James F. Masterson,* for appellee.

OPINION BY MR. JUSTICE MAXEY, January 6, 1942:

This is an appeal by the above defendants from an order granting a new trial after the jury in an action of trespass had returned verdicts in their favor. They claim that the evidence against them was so inconclusive that binding instructions should have been given and that the setting aside of the jury's verdicts was an abuse of discretion.

The plaintiff was treated professionally on October 5th, 1937, by the additional defendant. He described the treatment as follows: "He (the doctor) took an alcohol bottle and washed my back, then something with iodine on it, and rubbed my back and then took a bottle about

two inches deep, stuck a needle and pushed it in my back. He inserted the needle through the cork." He added: "I went home . . . I felt pain in the shoulder and arm. Then I couldn't move my arm or shoulder and I went down to the doctor and asked him what he had done to me. . . . Two days later I started to swell up; my shoulders went in an abscess". A little later Dr. Grahn "lanced the abscess". Treatments were continued for several days. A month later a more serious condition developed. He testified: "Back of my heart it raised up about the size of a quarter. I couldn't walk; I was bent over and the lump back of my heart was bigger than my head." He was taken to a hospital and was operated on. Three days later he was taken home and there confined to his bed for seven weeks, with "tubes draining from the back". He "had pains nearly a year before they started to leave" him. He had never before had any trouble with his back and "as a result of the abscess" he was incapacitated from work from October 5, 1937, to January 17, 1938, and also lost 16 days after January 17th. Plaintiff charges that Dr. Grahn, on or about October 5th and 7th, 1937, injected into the former's body "two injections of liver extract" which had been "made and sold and delivered to Dr. Grahn by the original defendant, The National Drug Company, either directly or through retailers or distributors" and that "this extract was impure, unsterile and unfit for use" and caused the bodily injuries stated. It is pleaded that the Drug Company "failed to use care to see that the drug was safe and fit for the intended use".

In bringing the additional defendant on the record, the Drug Company charged him with being "careless and negligent in the following particulars: (a) In the use of an unsterile or infected needle; (b) In the use of too great a quantity or dose of said liver extract; (c) In negligently and carelessly using and administering said liver extract to the said plaintiff."

Dr. Grahn when called as for cross-examination testified that he found the plaintiff on October 5th, 1937,

suffering from "secondary anemia" and that for his relief he injected into him "a concentrate from food liver, dispensed by The National Drug Company". The bottle "was bought through their representative". Its wrapper contained the following: "This preparation should be used only by a physician, and care must be taken to make aseptic injections. We assume full responsibility and guarantee the accurate preparation, careful testing and safety of this product. We do not assume responsibility for untoward conditions that may develop since such are invariably due to sensitivity of the patient or to indiscriminate use." The doctor described the sterilization by his technician with alcohol and iodine of the small area about the point of the injection. He described the bottle containing the liver concentrate used by him as follows: a "little metal container in which there is a small felt top which is impregnated with tr-cresol, which protects the cap—it is an excellent model with an excellent top. It sterilizes automatically as you put it in." His testimony as to the swelling on the patient's back and his other symptoms, after the injection, and as to the treatment in the hospital were substantially in accord with the patient's. He incised the patient's back and "pus came out". The back was again incised at the hospital. In the doctor's opinion the cause of the patient's abscess was "an irritant in the ampoule". He admitted that "it may be caused also by an unsterile hypodermic". He testified that "prior to Mr. Henderson's injection he had given an injection to a Mrs. Caldwell and "an abscess formed in due course at the site of the injection". He had previously given nineteen similar injections to Mrs. Caldwell and no abscesses followed, thus proving that she was not hyper-sensitive to this substance. From the same bottle the doctor had given two injections to a Mr. Hartnet late in September 1937 and this patient "developed two abscesses at the site of the injections". Hartnet had had "twenty-nine injections previously" of liver concentrate from other drug companies' bottles and no ab-

scesses followed. After Hartnet's two abscesses "cleared up", he received "eleven or twelve injections of the liver concentrate of another producer of this substance and no abscesses developed". The doctor injected a Mrs. Landen with the liver concentrate from the same National Drug Company bottle on September 27, 1937, and "she developed an abscess at the site of the injection, with the same clinical course". It was her first injection of this substance, but subsequently she received twenty-seven injections of this substance produced by other drug companies, and no ill effects followed. The doctor then testified that he had "given about three or four thousand injections of liver extract" and that "the only abscesses following" these injections were in the cases indicated. The abscesses were all sterile.

Dr. Lynn M. Rankin, who operated on the plaintiff for the abscess on his back testified that in his opinion the cause of that abscess was "the material that was injected" by Dr. Grahan. Dr. Patrick J. Kennedy, a pathologist, testified to the same effect. Dr. Abraham Cantarow, who had specialized in internal medicine and bio-chemistry, testified in answer to a hypothetical question that plaintiff's abscess "was due to some irritating material in the injected solution". Dr. L. S. Carey gave similar testimony. The foregoing constituted plaintiff's proof against *The National Drug Company.*

It is settled that a druggist or a manufacturer of drugs or medicines who negligently delivers a deleterious drug when a harmless one is called for is responsible for the harmful consequences to the user of that drug or medicine as being guilty of a breach of duty imposed on him by law to avoid acts dangerous to the lives or health of others. See 28 C. J. S., p. 515, sec. 9a (2). In *Hruska v. Parke, Davis & Co.,* 6 Fed. Rep. (2d) 536 (8 C. C. A.) the following is quoted with approval by Judge POLLOCK from the opinion of Judge SANBORN (characterized by Judge POLLOCK as "a most exhaustive and able compendium of knowledge of the subject-matter involved") in *Huset v. J. I. Case Threshing Mach. Co.,* 120 F. 865,

57 C. C. A. 237, 61 L. R. A. 303: "An act of negligence of a manufacturer or vendor which is imminently dangerous to the life or health of mankind, and which is committed in the preparation or sale of an article intended to preserve, destroy, or affect human life, is actionable by third parties who suffer from the negligence." (citing cases).

But negligence whenever alleged must be proved by legal evidence, either direct or circumstantial, unless the rule of res ipsa loquitur applies and that rule does *not* apply in this case. To support his charge of negligence against the Drug Company, plaintiff relies on the expert opinion of Dr. Grahn as to the "irritant in the injection" and on the facts that following the injection plaintiff developed the abscess, and abscesses followed injections from the same bottle administered to three other persons.

The conclusion plaintiff contends for against the Drug Company is based on this succession of inferences: (1) Dr. Grahn's inference that "there must have been an irritant in the injection I gave him". (2) The inference that this irritant was not an over-dose of the liver concentrate. (3) The inference from the testimony of Dr. Grahn and his technician, Miss Purnell, in respect to the sterilization of the syringe and needle used on the plaintiff that these were thoroughly sterile. (4) The inference that this sterilization eliminated the presence in the instruments of either a chemical *or* a mechanical irritant. (5) The inference that this irritant got into the concentrate before it came into Dr. Grahn's possession. (6) If all the preceding inferences are accepted, then the inference is to be drawn that the defendant Drug Company "negligently [as charged] failed to use care to see that the drug was safe and fit for the intended purpose".

It is the duty of the trial judge to decide in a case like this whether plaintiff's proofs are of such cogency that they should be permitted to go to the jury to effect the

intended persuasion. The test is whether there is proof on which the verdict plaintiff is seeking can *reasonably* be based. See *Metropolitan Ry. Co. v. Wright,* 11 App. Case 152. Thayer in his "Preliminary Treatise on Evidence" (p. 208) says that it is the function of the trial judge to "keep the jury within the bounds of reason".

Some courts have laid down the rule that "an inference upon an inference will not be permitted" and that a case based solely upon such reasoning must not be submitted to a jury. This court rejected that doctrine in *Neely et al. v. The Provident Life and Accident Ins. Co.,* 322 Pa. 417, 185 A. 784, cited with approval by Wigmore on Evidence, 3rd. ed., Vol. I, p. 436, sec. 41. However, it often happens that a case based solely upon a succession of inferences is so conjectural in character that it is not legally submittable to a jury.

The following statement by Judge Lockwood in *New York Life Ins. Co. v. McNeely* (Arizona), 79 Pac. (2d) 948 (endorsed by Wigmore, supra. p. 439), is applicable to the present case: "The courts have always insisted that the life, liberty and property of a citizen should not be taken away on possibilities, conjectures, or even, generally speaking, a base probability. In criminal cases they demand that when a conviction is to be based on a chain of inferences, each and every link in that chain must exclude every other reasonable hypothesis. In civil cases, involving only property rights, the rule is not so strict . . . But when an inference of the probability of the ultimate fact must be drawn from fact whose existence is itself based only on an inference or a chain of inferences . . . all prior links in the chain of inferences must be shown with the same certainty as is required in criminal cases in order to support a final inference of the probability of the ultimate fact in issue. . . . *The prior inferences must be established to the exclusion of any other reasonable theory rather than merely by a probability.* [italics supplied] . . . A certain quantum of proof is required when the

courts are asked to take away life, liberty or property."

The ultimate inference that plaintiff's injuries were due to the Drug Company's failure to use due care in the preparation of the liver concentrate is based on so many weak intermediate influences which do not exclude other equally reasonable inferences that it cannot be accepted as meeting the required measure of proof. The inference that the Drug Company failed to exercise due care in the preparation of the liver concentrate is not so compelling as to exclude the equally reasonable inference that Dr. Grahn did not exercise due care in its use. While claiming that he properly sterilized his needle before inserting it into the plaintiff, Dr. Grahn admitted that "an abscess may be caused by an unsterile hypodermic". In answer to the question: "When you take a needle and push it through [the skin] it is perfectly possible there may be some bacteria or something lurking in the skin at the time?" He replied: "It was remotely possible." While it is true that three other patients who received injections by the same physician from the same ampoule of liver concentrate which was used on the plaintiff developed abscesses like the plaintiff's, even this fact is as consistent with the theory of the negligence of Dr. Grahn as it is with that of the Drug Company.

The claim is *not* that the liver concentrate was *unsterile,* but that there was "an irritant" in it. An irritant may be either chemical or mechanical. When it is considered that before the liver concentrate got into plaintiff's system it had to pass through Dr. Grahn's syringe and needle and through plaintiff's skin, an inference cannot be reasonably drawn *to the exclusion of all other inferences that the presence of this irritant in the injection was due to the negligence of The National Drug Company.*

In the recent case of *Whigham v. Metropolitan Life Insurance Co.,* 343 Pa. 149, 22 A.2d 704, we said: "The burden of proof resting upon plaintiffs in civil actions cannot be met by conjectures. The phrase "burden of

proof" means exactly what it says. . . . In a *civil* case the evidence of facts and circumstances on which plaintiff relies and the inferences logically deducible therefrom, must so preponderate in favor of the basic proposition he is seeking to establish as to exclude any equally well supported belief in any inconsistent proposition."

In *Tremaine, Exrx., v. H. K. Mulford Co.*, 317 Pa. 97, 101, 176 A. 212, we said: "In the administration of justice the standards of legal proof must be maintained above mere conjecture. Defendant's negligence cannot be presumed or inferred simply from the patient's illness and death even though these did follow closely upon the use of the serum. . . . The presumption [1] was that the serum furnished by defendant had not been negligently prepared and that it was safe for the intended use; plaintiff in order to obtain and hold a verdict had to both plead and prove the contrary. . . . It is the function of a trial court to determine whether the finding asked for by a plaintiff is legally permissible from the evidence offered."

In the *instant* case, the facts were more favorable to the plaintiff than in the case just cited because here three other persons injected with the liver concentrate from the same ampoule also developed abscesses. But the fact that in all three cases the same physician administered

---

[1] This presumption belonged to this defendant. While our decision is not based upon anything offered by the defendant it may be noted that Samuel Etris, bacteriologist for the defendant company, testified that when the company obtained "liters of liver extract" from Wilson & Co., it is "pulled through a sterile Berkefeld filter . . . a filter so fine that it filters out any bacteria that is in microscopic organisms. In this process the material is pulled through by a vacuum, and if it contained any bacteria they would be left on the outside of the filter. The material comes through sterile, that is, not containing any organisms. The material was then divided into three bottles, and those three bottles are sent to what we call the filling room. In the filling room the bottle is set up, and the bottle is placed in a sterile filling machine. . . . The material is then syphoned into a burette, a young lady with a sterile gown and gloves sits in front of that case. . . . She puts her hand and fills the bottles from the burette. . . ."

the injection makes the hypothesis of his culpability as plausible as that of the Drug Company's culpability. The latter hypothesis derives added plausibility from the fact that ten days before the doctor injected this liver concentrate into the plaintiff he injected the same substance into three other patients, who quickly thereafter developed abscesses. After these experiences Dr. Grahn did not exhibit even elementary caution when he later administered to the plaintiff an injection of the same substance.

In holding that this record does not reveal a case of sufficient probative value against the National Drug Company to warrant its submission to the jury we are not unmindful that the public interest requires the holding of companies which make and sell drugs and medicines for use in the human body to a high degree of responsibility under both the criminal and the civil law for any failure to exercise *vigilance* commensurate with the harm which would be likely to result from relaxing it. This consideration, however, does not justify the courts in lowering the standards of proof in tort cases of this kind. If we did so the public interest would be ill served. If those who make and compound drugs and medicines in packages or bottles, under the strict conditions prescribed by the National Food and Drug Act (U. S. Code Annotated, Title 21) and the Public Health Act (Ibid, Title 42) for use by the public, can be mulcted in damages every time some person uses such drugs or medicines with harmful results, the making and selling of such products would be a most peculiarily hazardous enterprise. That a lowering of the standard of proof in such cases would open the door to colossal fraud is obvious.[2]

Appellee claims further that "even if the Drug Company was not negligent and the liver extract became

[2] ". . . Which of these forces shall dominate in any case must depend largely upon the comparative importance or value of the social interests that will be thereby promoted or impaired": Cardozo's "The Nature of the Judicial Process", p. 112.

impure or contaminated without negligence on its part, it was a direct breach of its warranty in that its product was not safe and therefore on the proof of breach of warranty alone the plaintiff would be entitled to a verdict against The National Drug Company". The answer is: This action is not founded on a breach of warranty. "An action against a druggist to recover for personal injuries should be ex delicto and not ex contractu except where the suit is based on an express warranty": 28 C. J. S., p. 517, sec. 10. It is, of course, not necessary to plead a warranty in cases like this, for the action is based upon a breach of duty *imposed by law*. "We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law.": Judge CARDOZO in *MacPherson v. Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050, 1053. See *Ebbert et al. v. Philadelphia Electric Co.*, 330 Pa. 257, 270, 198 A. 323. Nor would a pleading of an express warranty be of any avail with no more support than it had here. The Drug Company "guaranteed the accurate preparation, careful testing and safety of this product". Plaintiff offered no proof of the breach of this guarantee. There is no evidence that the concentrate was unsafe when it left the Drug Company.

Appellee cites the case of *Campbell v. G. C. Murphy Co.*, 122 Pa. Superior Ct. 342, 186 A. 269. There the Superior Court held that where a plaintiff ate food at a restaurant, and within an hour thereafter she became nauseated and later was found to be suffering from ptomaine poisoning, the case was for the jury. The opinion is based on the opinion of the same court in *West v. Katsafanas,* 107 Pa. Superior Ct. 118, 162 A. 685, holding that a sale of food or beverage intended for human consumption "carries with it an implied warranty that it is suitable and wholesome". It was declared further that "if the food is unfit for consumption and damages result there-

from they ought to be placed not upon one who has had no opportunity of determining its condition, but rather upon the one who has had means of informing himself of the condition of the food". It seems to have been conceded that the food was unfit for use and caused injury. In the Campbell case, supra, the inference was obvious that ptomaine poisoning resulted from the food the defendant supplied. There was no other equally probable cause for the poisoning. Whether a case of this kind is tried on the theory of a breach of an implied warranty or on the theory of tort is immaterial. One seeking damages from a food manufacturer for injuries caused by eating unfit food is not compelled to elect between implied warranty and negligence as a ground of recovery: *Alfred Davis v. Van Camp Packing Co.,* Iowa Supreme Court, 89 Iowa 775, 176 N. W. 382, 17 A. L. R. 649, 650.

In reaching our conclusion as to the inadequacy of proof against the Drug Company we do not intend to depart from the rulings in those cases (supra) wherein the sales of food alleged to be diseased or otherwise unfit for human use a prima facie case was made out upon proof that illness or death traceable to it quickly followed its consumption. See also *Catani v. Swift & Co.,* 251 Pa. 52, 95 A. 931, and the later decision in Swift & Co., 262 Pa. 184, 105 A. 55, modifying the ruling in the Catani case. In *Rozumailski v. Phila. Coca-Cola Bottling Co.,* 296 Pa. 114, 145 A. 700, where a customer who drank a bottle of coca-cola was injured by swallowing broken glass which was in the bottle, this court held that since the contents of the bottle of beverage were undisturbed until the bottle reached the consumer, the jury should be permitted to infer the defendant's negligence. That case is easily distinguishable from the instant case because *there* the injurious substance "was actually found in the bottle".

In a situation like this the question whether or not a prima facie case against the alleged tortfeasor is made out is sometimes difficult to decide. (See the leading case of *Davis v. Van Camp Packing Co.,* above cited.) In the

instant case, our conclusion is that the responsibility which plaintiff seeks to fasten upon the defendant Drug Company rests chiefly on conjecture. When under the evidence there is a cause other than the one plaintiff charges to which it would be *equally reasonable* to attribute the injury complained of, the jury will not be permitted to capriciously choose between them. A decision by chance can never be accepted as an act of judgment. "In admitting evidence in our law, it is always assumed to be logically probative, i. e., probative in its own nature,—according to the rules that govern the process of reasoning. . . . Bad reasoning in the law of evidence like bad reasoning in all other parts of the law is simply bad reasoning; and it is never good law".[3] The Drug Company was entitled to the binding instructions it asked for.

As to the additional defendant, Dr. Henry V. Grahn, a prima facie case was made out in support of the allegation that he "negligently and carelessly used and administered said liver extract to the said plaintiff". Whether the "irritant" which caused plaintiff's abscess was in the concentrate itself or in the dosage or in the doctor's syringe or in the needle or was due to the doctor's technique does not appear, but in any of these contingencies *this defendant would be liable if he had notice that harm to the plaintiff would be likely to follow the injection.* He was put on such notice by the abscesses which had developed in his three other patients. One of these injections was given seven days before Henderson's was given and another one was given ten days before. If they developed "the same clinical course" as the Henderson injection, the symptoms of abscess must have appeared at the end of two days. These were ample cautionary signals and if in the face of them the doctor injected the same substance in the same way into the plaintiff his action could reasonably be characterized as negligent.

---

[3] Professor James Bradley Thayer on "Law and Logic", 14 Harvard Law Review, p. 139.

"Most liabilities in tort . . . are founded on the infliction of harm which the defendant had a reasonable opportunity to avoid at the time of the acts or omissions which were its proximate cause": Holmes: "The Common Law", p. 145.

The trial judge's instructions to the jury in the case against Dr. Grahn were that "if he made the plaintiff's skin and the instruments sterile and administered the proper dose of liver extract and the method used by him was the standard method used by physicians" the jury "may well find that he was not guilty of negligence in administering the liver extract in this case". These instructions ignored the alleged negligence of Dr. Grahn in injecting into the plaintiff a substance which he knew or had reason to believe had recently caused abscesses in three other patients. In the case against Dr. Grahn the binding instructions asked for were properly refused, but the court's charge was inadequate and to the plaintiff prejudicial.

The judgment of the court below in granting a new trial in the case of Donald Henderson v. The National Drug Company is reversed.

The judgment of the court below in granting a new trial[4] in the case of Donald Henderson v. Dr. Henry V. Grahn is affirmed.

---

[4] Future proceedings in this case are governed by the Sci. Fa. Act of April 10, 1929, P. L. 479, section 1, as amended, 1931, June 22, P. L. 663, section 2; 1933, May 18, P. L. 807, section 1; 1937, June 25, P. L. 2118, section 1. (See section 141 of 1941 Pocket Part of Purdon's Statutes, Title 12. See also as to Sci. Fa. Act, 2 Standard Pennsylvania Practice, Section 90, page 415 et seq.) Rule 2258a of the Pennsylvania Rules of Civil Procedure does not apply to this case, for Rule 2274 provides that "these rules shall become effective on the fourth day of September 1939, but shall not apply to actions pending at that time." This action was begun on January 24, 1939. (By Rule 2275, the provisions of the Sci. Fa. Act were suspended on September 4, 1939, except as they applied to actions pending.)