### MANNSZ v. MACWHYTE CO. et al.
### ELLIS v. SAME.
#### Nos. 8999, 9000.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 22, 1946.

Decided May 8, 1946.

Mahlon E. Lewis, of Pittsburgh, Pa. (William J. Kenney and Stewart & Lewis, all of Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, MARIS and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

The plaintiff, Dorothy King Mannsz, a citizen of Pennsylvania, the widow of Donald King, brought suit in the Court of Common Pleas of Allegheny County, Pennsylvania, against Macwhyte Company (Macwhyte), an Illinois corporation, and against Bradford Supply Company (Bradford), a Pennsylvania corporation. Donald King purchased from Bradford at Warren, Pennsylvania, a wire rope, described hereinafter, used by him to support a scaffold on which he and Myron R. Ellis worked. The rope broke, causing one end of the scaffold to fall to the ground. King was killed; Ellis was injured. Mrs. Mannsz' suit was removed to the court below pursuant to Section 28 of the Judicial Code, 28 U.S.C.A. § 71. The court below, ruling that Mrs. Mannsz' cause of action against Macwhyte was separate and distinct from her cause of action against Bradford, remanded her action against Bradford to the Court of Common Pleas of Allegheny County. Ellis sued Bradford and Macwhyte in the court below in a single suit. It appears that a motion, made by Bradford to dismiss Ellis's action as to it because of lack of diversity, was granted.[1]

Before answer Macwhyte filed a motion to dismiss the Mannsz suit on the ground that the complaint did not set forth a cause of action. The motion was denied[2] by the court below on the authority of Sierocinski v. E. I. DuPont De Nemours & Co., 3 Cir., 118 F.2d 531. Both cases were then brought on for trial. It was stipulated that the Ellis proceeding should be treated as if a like motion had been made by Macwhyte and had been disposed of as had

James J. Burns, Jr., of Pittsburgh, Pa., for appellants.

[1] We again call the attention of counsel to the provisions of our Rule 26. It is the duty of the attorneys for the parties to print in the appendix all matters which should be called to the court's attention.

[2] See King v. Macwhyte Co., D.C., 60 F. Supp. 75.

Macwhyte's motion in the Mannsz case. Both cases were then tried together.[3] At the close of the plaintiffs' evidence the court below granted motions made by Macwhyte for directed verdicts. The plaintiffs moved for new trials. The motion was denied. See D.C., 60 F.Supp. 76. Both plaintiffs have appealed.

The complaints in both cases assert breach of warranty and negligence by Macwhyte, charging it with improperly manufacturing the rope, with not having inspected it properly, and with having negligently represented it as fit for the purpose for which it was used. In its answer Macwhyte denied that the rope was not properly manufactured or adequately inspected and asserted that it was not used by King for the purpose for which it was manufactured.

■ The evidence shows the following, taking those inferences therefrom most favorable to the plaintiffs. King used the wire rope to suspend a scaffold upon which he and Ellis were working. Specifically, the wire rope, 16 feet in length and cut into two pieces of about equal length, was employed by King to hang from a channel iron blocks, pulleys and hooks which, in turn supported other ropes connected to the scaffold.

The evidence showed that the two pieces of wire rope were clamped into closed loops and from each of these loops was hung a block connected by tackle with another block, from which in turn the scaffold was suspended. The wire rope in turn was fastened around a channel iron at the top of the building from which the whole scaffold and its accouterments were hung. The channel iron had an edge which, though not sharp in any literal sense, none the less might cut by abrasion a wire rope of the sort employed by King.

There was uncontradicted evidence that the wire rope had been "moved" two or three times; that is to say, had been fastened or unfastened several times as the scaffold had been moved from building to building. There was also testimony that the scaffold might have swung a little as the men moved upon it. The left hand section of the wire rope broke. If it were proven that the break occurred at some point around the channel iron, the plaintiffs probably could not recover for it might then be assumed that the rope had been cut by abrasion. The evidence, however, shows that the break occurred "* * * in the area below the channel iron".[4] The word "area" was used by the witness to designate that part of the wire rope which lay beneath the channel iron. The parting of its fabrics apparently did not take place because of abrasion as warned against in the manual heretofore referred to.

The scaffold and its accouterments[5] weighed not more than 300 pounds. King weighed 150 pounds and Ellis weighed 170 pounds. The total burden upon the wire rope did not exceed 650 pounds. Actually the suspended weight was one-half of this since the scaffold was hung from two places, halving the weight.

The plaintiffs introduced into evidence a manual published by Macwhyte. At the top of the pertinent page appears the following: "Macwhyte Wire Rope, 6x42, Tiller or Hand Rope". There follows a printed similacrum of the rope and a cross-section of it. Then appears, inter alia, the following:

"This is the most flexible wire rope made but because of its fine wires, it should be subjected to very little abrasive wear. It is made of 6 strands of 42 wires each,[6] a total of 252 wires. Each strand is a complete 6x7 rope fabricated around a central hemp cord making 7 hemp cords in all.

"It is used as a hand rope in connection with the operating device of passenger and freight elevators, as steering cable on small

---

[3] Mrs. Mannsz' case was at No. 2120 in the court below and is on appeal at our No. 8999. Ellis's case was at No. 2592 in the court below and is on appeal at our No. 9000.

[4] See testimony of Smith, p. 62a.

[5] These may have included a number of steel sheets with which the men were working. The sheets may have increased the weight on the scaffold by another 100 pounds.

[6] Hence the designation in the manual and in the complaint as "6x42" wire.

boats and steamers, and for industrial and mining devices.

"Prices: List Price for Bright Ropes are shown below. Any rope smaller than that listed takes the price of the smallest rope listed. Any other omitted sizes take the next largest price shown. For Galvanized Ropes add 25% to these lists and apply the Bright Rope discount."

Then follow the words and figures: "Macwhyte 6x42 Tiller Rope" and a chart in box form. The first column headed "Diameter in Inches" gives various widths of rope beginning at ⅜ths and running to ⅞ths including ⁵⁄₁₆ths. The next column headed "List Price Per Foot", is divided into 3 sub-columns headed respectively, "Iron", "Cast Steel" and "Plow Steel". Under the heading "Iron" and parallel to the figures "⁵⁄₁₆" hereinbefore referred to appears ".08". The third column is headed "Approx. Weight Per Ft. in Lbs." and in this column parallel to the figures "⁵⁄₁₆" and ".08" appears ".11". The last column is headed "Approx. Breaking Strength in Tons of 2000 lbs." This column has three sub-headings, viz., "Iron", "Cast Steel" and "Plow Steel" and under the column headed "Iron" and parallel to the figures heretofore specifically designated, "⁵⁄₁₆", ".08" and ".11" appear the figures ".977". Translating the foregoing into non-technical language it would appear that the wire rope used by King should have supported a weight of almost one ton or, using a very broad margin of safety, more than twice that which had been put upon it when the accident occurred.

Macwhyte, asserting that the wire rope was not put to any use for which it was intended, pointed out that it was not used as a hand rope in the operation of an elevator or as a steering cable on a small boat or for industrial and mining signal devices, or put to any like use. The plaintiffs assert that this is immaterial; that the table of tensile strengths quoted from the manual was none the less applicable; that the tensile strength ascribed by the manual to wire rope of this size was much more than was required to suspend safely the weight that it was required to carry.

Macwhyte contends that since the wire rope was galvanized it was not within the purview of the tensile strengths shown in the manual. This contention, however, is belied by the page itself. The only reference to "Galvanized Ropes" was the following, "For Galvanized Ropes add 25% to these lists and apply the Bright Rope discount." As will be observed the allusion to galvanized ropes relates only to price and not to tensile strength. The table of tensile strengths immediately follows the sentence quoted. The representation in the manual therefore is to the effect that galvanized wire ropes would possess the same or substantially the same tensile strengths as the ungalvanized ropes referred to in the manual. No substantial evidence was introduced which indicates that galvanized wire ropes possess less tensile strength than wire rope which is not galvanized.[7]

The rule enunciated by the Supreme Court in Klaxon Co. v. Stentor Electric Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 requires mention. That ruling is to the effect that in diversity of citizenship cases, such as those at bar, a federal court must follow the rule of conflict-of-laws of the State in which it sits. The conflict-of-laws rule of Pennsylvania is that the law of the place where the operative facts occurred must govern the rights of the parties. See the Pennsylvania Annotations to Section 378, Restatement, Conflict of Laws, as cited. Since the operative facts took place in Pennsylvania that law will govern the substantive rights of the parties. Under Pennsylvania law the plaintiffs may approach the goal of recovery by two roads as they have attempted to do in the cases at bar: viz., (1) by proof of breach of express warranty or (2) by proving that Macwhyte was negligent in its manufacture of the wire rope or in the inspection of it. We think it is clear that whether the approach to the problem be by way of warranty or under the doctrine of negligence, the require-

---

[7] McCarthy, an employee of Bradford, who sold the rope, testified that galvanization might reduce the tensile strength of the rope 1 or 2% but added " * * * I don't know." This is all the testimony in the record on this subject. The witness was not qualified as an expert.

ment of privity between the injured party and the manufacturer of the article which has injured him has been obliterated from the Pennsylvania law. The abolition of the doctrine occurred first in the food cases, next in the beverages decisions and now has been extended to those cases in which the article manufactured, not dangerous or even beneficial if properly made, injured a person because it was manufactured improperly. Compare the early case of Holmes v. Tyson, 147 Pa. 305, 23 A. 564, 15 L.R.A. 209, with recent foods and beverages cases such as Scalise v. F. M. Venzie, Inc., 301 Pa. 315, 152 A. 90, and Nock v. Coca-Cola Bottling Works, 102 Pa. Super. 515, 156 A. 537.[8] Compare the decision in Henderson v. National Drug Co., 343 Pa. 601, 23 A.2d 743. In the Henderson decision the Supreme Court of Pennsylvania indicated, albeit by way of dictum, that it would have held the manufacturer of a food liver concentrate guilty of negligence if it had proved that the concentrate had been prepared improperly or contained an irritant substance. See also the decision in Saganowich v. Hachikian, 348 Pa. 313, 35 A.2d 343. In this case the plaintiff, an employee of the purchaser of a drum of liquid caustic soda, was permitted to recover against the manufacturer of the soda who had equipped the drum with a defective plug. The plug came loose, spraying the employee with caustic which injured him. Compare such cases as Ebbert v. Philadelphia Electric Co., 330 Pa. 257, 198 A. 323, and Wissman v. General Tire Co., 327 Pa. 215, 192 A. 633.

The Supreme Court of Pennsylvania has approved expressly the doctrine enunciated by Judge Cardozo in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas. 1916C, 440. Indeed in the Henderson case (343 Pa. at page 611, 23 A.2d at page 749) Mr. Justice Maxey quoted from the MacPherson case as follows: " 'We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. * * * We have put its source in the law.' " We entertain no doubt that the law of Pennsylvania has come to the modern view suggested by Mr. Francis H. Bohlen nine years ago. That view is set out in the footnote.[9] It should also be pointed out that the Supreme Court of Pennsylvania frequently has adhered to the Restatement, Torts, in cases somewhat analogous on their facts to those of the cases at bar.[10] We think that the Pennsylvania law which must be considered under the plaintiffs' proof, whether by way of proof of breach of warranty or proof of negligence, is embodied in the Restatement, Torts, Section 395. Section 395 is as follows: "A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured." Section 395 is in fact a restatement of the language

---

[8] As is stated in the "Pennsylvania Annotations" to the Restatement, Torts, Pa. 212, "The food cases are complicated by the Act of May 4, 1889, P.L. 87, 69 P.S. § 123 note, which creates an implied warranty in a sale of food that the food is 'sound and fit for household consumption,' and by the Sales Act of May 19, 1915, P.L. 543, Secs. 14 and 15, 69 P.S. §§ 123, 124." See Catani v. Swift & Co., 251 Pa. 52, 95 A. 931, L.R.A.1917B, 1272, and the other cases cited in the Annotations.

[9] See Bohlen, Fifty Years of Torts, 50 Harv.Law Rev. 1225, 1234. Mr. Bohlen stated, "In Pennsylvania the earlier decisions which [absent privity between the purchaser and manufacturer] denied liability on the ground that its imposition would prevent any sane man from becoming a manufacturer or a contractor have been so whittled away that it may be safely said that it only requires a decision directly presenting facts similar to those in MacPherson v. Buick Motor Co. to cause the court to overrule the earlier decisions and accept the modern view."

[10] See for example the Saganowich case, supra, citing with approval the Restatement, Torts, Section 392, Ebbert v. Philadelphia Electric Co., supra, citing Sections 402 and 388, and Wissman v. General Tire Co., supra, citing Sections 394 and 395.

employed by Judge Cardozo in the Mac-Pherson case quoted above.

■ Dealing now with the alleged breach of warranty, ((1) supra), we state that the plaintiffs endeavored to prove that the contents of Macwhyte's manual came to King's knowledge and that he bought the wire rope because of the representations contained in it. The plaintiffs failed in this proof but in our opinion it was unnecessary to make it. McCarthy, the salesman employed by Bradford, testified that the manual was Macwhyte's manual, that it was widely disseminated by Bradford to purchasers and to prospective purchasers. This is important because the words and figures of the manual were a representation by the manufacturer of the tensile strength of the wire rope and the purposes for which it was manufactured. These representations ran to the public, to King and to Ellis, for as we have demonstrated no privity between Macwhyte and King and Ellis had to be shown. We conclude that the representations of Macwhyte's manual constituted an express warranty within the provisions of Section 12, P.L. 543 (1915), 69 P.S.Pa. Sec. 121.[11] The representations of the manual as to the tensile strength of the wire rope of the size purchased by King were binding on Macwhyte. If King was killed and Ellis was injured because the wire rope broke, having been subjected to less strain than that set forth in the table of tensile strengths, the plaintiffs would be entitled to recover by way of breach of express warranty provided the wire rope was used by King for a purpose intended by Macwhyte. At this point the plaintiffs' case, insofar as it is based on warranty, fails for it is clear that King did not use the rope for any purpose specified in the manual or for a purpose analogous to those specified. Our reasons for this conclusion follow.

The manual states: "It [the wire rope] is used as a hand rope in connection with the operating device of passenger and freight elevators, as steering cable on small boats and steamers, and for industrial and mining signal devices." The title of the page, printed in large capital letters, is "Tiller or Hand Rope". The manual also states, "This is the most flexible wire rope made * * *". Obviously Macwhyte did not intend the wire rope to be used only in connection with the operating device of an elevator or as a steering cable for a small boat or for industrial and mining signal devices. Any analogous use would be within the purview of the paragraph last quoted. But to employ the wire rope for the suspension of a load and a "live" load at that, viz., to support a scaffold on which men were working with the inevitable concomitant of ever-shifting tensions and strains,[12] may not be deemed to be within the scope of the purposes designated by Macwhyte in its manual. None of the purposes designated by Macwhyte included the suspension of any large load, dead or live.

■ This conclusion is supported by other phrases which we have quoted from the page of the manual. A tiller rope is a rope used for turning the tillers of "small boats and steamers". A hand rope is a rope to be hauled or manipulated by hand. Such ropes, for example, are employed for the operation of the valves of water-lift elevator mechanisms. It is a matter of common knowledge that the quality of great flexibility and the quality of great strength ordinarily do not occur in the same kind of wire rope. In this connection we point out

---

11 The pertinent portion of the statute is as follows: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, * * *." See also the Uniform Sales Act, Section 12.

12 See Kidder-Parker, Architects' and Builders' Handbook, 18th Ed., p. 126, in pertinent part as follows: "Dead Loads and Live Loads. The term Dead Load means a load that is applied and increased gradually and that finally remains constant, such as the weight of a structure itself. The term Live Load means a load that is applied suddenly and causes vibrations, such as a train traveling over a railway bridge. It has been found by experience that the effect of a live load on a beam or other piece of material has twice the destructive tendency of a dead load of the same magnitude or intensity. Hence a piece of material designed to carry a live load should have a factor of safety twice as large as one designed to carry a dead load."

that the manual asserts that the Macwhyte tiller or hand rope is "the most flexible wire rope made". The table of tensile strengths in the manual must be read in the light of the manufacturer's stated uses for the wire rope and with due regard for all other pertinent statements in the manual.

We conclude that under the representations of the manual, which serve to define the scope of the warranty, the court below properly concluded that King had not used the wire rope for a purpose set out in the manual. No sufficient proof of breach of express warranty was made by the plaintiffs.

We will deal now with the asserted negligence of Macwhyte, ((2) supra). Since it is no longer necessary to prove privity between manufacturer and injured person and since the Pennsylvania Supreme Court has put the manufacturer's duty "to safeguard life and limb" "in the law" [13], if an article used for the purpose for which it was intended is defective and an accident results therefrom the manufacturer is liable. But the wire rope employed by King was not used for the purpose for which Macwhyte manufactured it. If it had been used as intended, despite the fact that the Supreme Court of Pennsylvania denies the application of the doctrine of res ipsa loquitur, we would conclude that the jury would be entitled to infer that the wire rope had been manufactured improperly and that a resulting defect has caused it to break. An analogy is supplied by Giordano v. Clement Martin, Inc., 347 Pa. 61, 31 A.2d 504.

Since it is clear that the wire rope was used by King for a purpose for which it was not manufactured by Macwhyte, no inference of negligence in manufacture from the mere fact that the rope broke could be drawn by the jury. The plaintiffs therefore were faced with the burden of proving that the rope broke not because it was used for a purpose for which it was not intended but because of a defect in manufacture. They fell far short of sustaining this burden. Their nearest approach lay in two questions asked by their counsel of Abbott who testified on their behalf. The first question in pertinent part was as follows, "In your opinion, would it be safe to use rope of that character [used by King] of good manufacture and in good condition, to sustain * * * [the] load * * * [under the circumstances]?" The witness answered, "I do." Reading the answer, "I do" as "Such would be my opinion", it will be observed that the answer falls far short of proving negligence in the manufacture of the wire rope. The second question, which came very close to the point, was as follows, "To you, as an experienced man in this business, [sic] in your opinion would this rope have parted had it been up to standard?" The witness never answered the question. No proof whatsoever was adduced as to any negligent inspection of the wire rope by Macwhyte.

The judgments are affirmed.

---

[13] In Henderson v. National Drug Co., 343 Pa. at page 611, 23 A.2d at pages 748, 749, Mr. Justice Maxey stated that an action for personal injuries brought against the manufacturer, not based on an express warranty, should be ex delicto and not ex contractu, citing 28 C.J.S. Druggists, § 10, page 517. Mr. Justice Maxey went on to say, "It is, of course, not necessary to plead a warranty in cases like this, for the action is based upon a breach of duty imposed by law."