**Mrs. Louise RIDEAUX, a Widow,
Libelant,**

v.

**LYKES BROS. STEAMSHIP COMPANY, Inc., and S. S. THOMPSON LYKES, Respondents,**

v.

**PAULSEN–WEBBER CORDAGE CORPORATION, Impleaded Respondent.**

**Hartford Accident & Indemnity Company, Intervenor.**

**No. A.D. 63–H–135.**

United States District Court
S. D. Texas,
Houston Division.

March 29, 1968.

Mandell & Wright, Herman Wright & Sidney Ravkind, Houston, Tex., for libelant.

Royston, Rayzor & Cook, Carl O. Bue, Jr., Houston, Tex., for respondents and intervenor.

Watkins, Ryan & Hamilton, A. J. Watkins, Houston, Tex., for impleaded respondent.

## MEMORANDUM

HANNAY, District Judge.

On October 24, 1963, the Libelant, Mrs. Louise Rideaux, a widow, an American Citizen, residing in Houston, Harris County, Texas, filed suit against the Respondent Lykes Bros. Steamship Company, Inc., a foreign corporation, doing business in the State of Texas and engaged in interstate commerce and the owner of the S. S. Thompson Lykes. The Respondents will hereinafter be referred to as Lykes. Libelant's action is to recover compensatory damages by reason of the death of her husband, Howard Rideaux, on or about July 15, 1963, while working as a longshoreman in Hatch Number Three of the S. S. Thompson Lykes and discharging forty-foot long steel "I" beams. She was the sole beneficiary of Howard Rideaux. The slings holding a load of beams, parted, or broke, permitting the beams to fall and crush the Libelant's decedent. Libelant alleges that the death of her husband was caused by the negligence of Lykes and the unseaworthiness of the slings ("snodders") used in the discharge operation. This action is brought under the Texas Wrongful Death Statute, Article 4671 et seq., Vernon's Annotated Texas Civil Statutes, and the Texas Survival Statute, Article 5525, Vernon's Annotated Texas Civil Statutes.

On February 19, 1965, Lykes filed an impleading Petition against Paulsen-Webber Cordage Corp. as Impleaded Respondent, hereinafter called Paulsen-Webber, alleging that Lykes had purchased from Paulsen-Webber wire cable in use on the S. S. Thompson Lykes at the time of the mishap above referred to and alleged that Paulsen-Webber was negligent and also breached its contractual duties to Lykes and that Paulsen-Webber is liable to indemnify Lykes for any damages that it may be required to pay because of the libel filed herein by the Libelant, including reasonable proctors' fees, court costs and disbursements.

On March 5, 1965, Paulsen-Webber filed its Answer in which it says that if Lykes has sustained or will sustain any damages as a result of the libel brought against it by Libelant in this cause, then such damages did not result from any neglect or fault on the part of Paulsen-Webber, whether in contract or in tort.

Thereafter, after numerous motions had been filed and passed on, the case came to trial before the Court without a jury.

After the trial each of the three parties to the suit filed numerous and lengthy briefs. Lykes, in its brief admitted liability for the death of Howard Rideaux, leaving as between Lykes and the Libelant only the issue of damages, which will be discussed further.

The only other question then, was whether Lykes is entitled to recover indemnity from Paulsen-Webber?

On September 28, 1966, Hartford Accident and Indemnity Company (a corporation) filed an intervention joined by Lykes asking for subrogation for the amount that they had paid under the Longshoremen's and Harbor Workers' Compensation Act to Libelant, the amount having been at the time of the filing of such intervention $6,463.75. Thereafter, it was stipulated by all the

parties that the death benefits and funeral expenses should constitute a valid lien on any judgment or decree entered by this Court in favor of Libelant against Lykes and/or against Paulsen-Webber.

Considering first the question of damages. Libelant alleges that Howard Rideaux was fifty years of age and that he had a life expectancy of many years according to the United States Life Tables and that he was a kind, considerate and dutiful husband and provided well for his wife and that he would have, in all reasonable probability, continued during his natural life to have so provided for Libelant. It is also alleged that he was hard working and industrious and earned approximately $7,200.00 per year and that in all reasonable probability his income would have increased. This was later changed by Libelant to $6,300.26. Libelant alleged that he contributed greatly to her, that she was wholly dependent upon him for support and that she had sustained damages by the reason of the death of her husband including $15,000.00 for his conscious pain and suffering, the total amount of Libelant's claim being in the sum of $200,000.00.

■ Considering first Libelant's claim for conscious pain and suffering. Inasmuch as Howard Rideaux was struck a terrific blow from the rear crushing his skull, breaking his neck and injurying his chest, causing his death instantly, no allowance for conscious pain and suffering should be or is allowed.

■ The correct measure of recovery of damages herein should be equivalent to actual compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have inured to Libelant for continued life as under the evidence could be expected of her husband Howard Rideaux. See: Chesser v. United States, 5 Cir, 387 F.2d 119, 1967, citing Hoyt v. United States, 5 Cir, 286 F.2d 356, 1961.

"Pecuniary benefits" as applied to Libelant meant not only money, but anything that could be valued in money including reasonable pecuniary value of counsel, protection, advice, services, care and attention that she would have in reasonable probability have received from her husband. Camco, Incorporated v. Evans, Tex.Civ.App., 377 S.W.2d 703, at p. 708. Testimony regarding prospective wage scale raises and cost of living increases is speculative and of little help. See: Mims v. United States, 375 F.2d 135, 140, 5 Cir, 1967.

In Har-Pen Truck Lines, Inc. v. Mills, 378 F.2d 705, at 709, in a personal injury and death case decided by the Fifth Circuit in 1967, the Court, speaking through Judge Goldberg, said:

"* * * Past earnings are indicative but not conclusive, and defendants would have us stare fixedly at the past with no thought of change in the future. * * * If the jury were restricted to the past for its answers, its computation of loss might have to be purely arithmetic; but the jury may look forward as well as backward, as long as it relies on such relevant and appropriate evidence as is available."

Claim was made by Libelant in its last brief for interest at the legal rate from the date this cause of action arose.

She also desires the question of vacation pay and average yearly wage increases to be taken into account.

■ This is an admiralty case and the question of pre-judgment interest is discretionary with the court. Sabine Towing Co. v. Brennan, 5 Cir, 85 F.2d 478, 484.

■ Lumping and considering all of the factors to be decided in arriving at damages, including the decedent's age, health, condition in life, habits of industry and sobriety, mental and physical capacity, disposition to frugality, customary and probable earnings in the future then as well as the past and the use made of them (discounted for pres-

ent payment) decedent's life expectancy and his work expectancy, and without any allowance for Libelant's loss of decedent's companionship, or as solace for grief, I find and decide that Libelant is entitled to receive from Lykes as reasonable, fair and just damages the total sum of $54,350.00 with interest at the rate of 6% per annum from date of judgment until paid. Chesser case supra, 387 F.2d p. 121. Out of this amount she is to repay the Intervenor Hartford and Lykes respectively the sums that each has paid her because of her husband's death up to date of such re-imbursement. Haynes v. Rederi A/S Aladdin, 5 Cir, 1966, 362 F.2d 345.

Turning now to the question of indemnity. From the preponderance of the evidence, I find and hold that:

1. The load of steel which fell back into the hold and crushed Libelant's decedent was being lifted from the hold at the time of the accident by longshoremen who were conducting a normal and usual operation.

2. The lifting was done by means of the ship's booms and winches, the steel being angled up out of the hold and taken across the deck and rail of the vessel to a railway gondola car on the dock alongside the vessel.

3. In lifting the steel from the hold it was necessary to employ two slings, one forward on the load and one aft on the load, with the steel "I" beams constituting the load, because they were longer than the hatch opening, being angled up out of the hold.

4. At the time of the accident the after sling failed first, allowing the lower end of the steel to swing forward, following which the forward sling failed and the upper or forward end of the steel fell back to the aft end of the hold.

5. The slings were fabricated of 6 x 31 three-quarter inch diameter wire rope; the rope had been sold by Paulsen-Webber to Lykes in response to a Lykes purchase order, a substantial quantity of such rope having been supplied by Paulsen-Webber to Lykes on March 19, 1963.

6. From the quantity of wire rope delivered by Paulsen-Webber to Lykes, Lykes itself fabricated the two slings by cutting the rope into suitable lengths, unbraiding each end of the wire rope, and then rebraiding it to form eyes at each end of the slings.

7. Following the accident Lykes delivered to Paulsen-Webber a sling made from the same quantity of rope for purposes of having tests performed and these tests were performed both on the rope and on the eyes or splices fabricated by Lykes and Lykes was then advised by Paulsen-Webber of the results of its examination and tests.

8. The examination and tests of Paulsen-Webber showed absolutely no defect in the wire rope itself but did show and Lykes was so advised that Lykes' fabrication of the slings, and its weaving of the eyes in the slings, was substantially deficient in several stated particulars.

9. The wire rope was tested by Lykes itself, through its attorneys and their selected experts, almost immediately after the accident occurred and Lykes, its attorneys, and their own experts failed to find any defect at all in the wire rope itself.

10. In due course Libelant requested the opportunity to examine the wire rope, had such examination conducted by experts of its own selection, and these experts also failed to find any defect in the wire rope itself.

11. Before the reel of wire rope ever left Paulsen-Webber's manufacturing facilities, it was tested at the testing laboratories of Bucknell University by a doctor of civil engineering, who is director of materials testing at Bucknell University and that test also established that the wire rope in question met all specifications as to strength.

Mr. Kaufman, the Vice-President of Paulsen-Webber, gave his opinion as an expert that the eye-splice pulled out first. He further stated that the typi-

cal eye-splice made by Lykes' personnel was inadequate in four significant respects:

(1) There should have been four tucks.

(2) The splice should have been hammered down after fabrication.

(3) The tips of the dead end of the spliced wires should not have been cut off so close to the last tuck.

(4) The splice had not been pulled tight enough.

He concluded that the combination of these factors was the reason that the splice failed. It is highly significant that Lykes did not produce any witnesses from its gear room to testify as to where in the hatch the two "snodders" were found or to testify as to the manner in which the "snodders" were made or manufactured.

■ Based upon the facts and evidence, I specifically conclude:

1. The wire rope purchased from Paulsen-Webber by Lykes was not being used in the manner for which it was intended at the time of the mishap in question, but was used in an incorrect and improper way over which Paulsen-Webber had no control.

2. Paulsen-Webber used due and ordinary care under the circumstances in the design, manufacture and inspection of the wire rope before its delivery to Lykes. Paulsen-Webber used reasonable care to produce a wire rope that was reasonably fit for the intended purpose.

3. Paulsen-Webber was not guilty of any negligence, and not being negligent it was not proximate cause of the mishap in question. See: Jones & Laughlin Steel Corporation v. Matherne, 348 F.2d 394, 401, 5 Cir, 1965.

■ It is now well settled that under the law of implied warranty, the manufacturer is not charged with the burden of absolute liability, but only of strict liability. However, strict liability does not mean that a manufacturer of a product is an insurer.

See: Shamrock Fuel & Oil Sales Co. v. Tunks, Tex., 416 S.W.2d 779, 785.

Likewise, in the case of Texas State Optical, Inc. v. Barbee, 417 S.W.2d 750–751, the Beaumont Court of Civil Appeals of Texas, in which there was RNRE, held the products liability law in Texas has not extended to the point to affix liability without fault. To the same effect is Schemel v. General Motors Corporation, 384 F.2d 802–805, decided July 17, 1967, 7 Cir. In the case of Olsen v. Royal Metals Corp., January 3, 1968, 392 F.2d 116, the Fifth Circuit wrote:

"* * * Even where there is proof of a product in a defective condition which is unreasonably dangerous to a user, no liability ensues unless the injury occurred during an intended use of the product."

This case also cites with approval the well reasoned recent case, Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, decided by the Fifth Circuit on October 20, 1967, rehearing denied January 2, 1968. The Curtis case supra at p. 860, discussed and defines the difference between adequate directions for the use of a product and the necessity for adequate warnings.

In the Olsen case supra, in considering the design of a product, has this to say:

"For the design to be unreasonably dangerous, it must be so dangerous that a reasonable man would not sell the product if he knew the risk involved."

Surely the steel wire rope here involved was not a dangerous product as has just been defined.

In Procter & Gamble Manufacturing Co. v. Langley, 422 S.W.2d 773, decided by the Dallas Court of Civil Appeals of Texas, in 1967, it was declared that a prior failure to follow instructions or to heed presented warnings with reference to a product precluded recovery under product liability or implied warranty theories for resulting damage. It also held on p. 777, in which it quotes from Section 402A Comment (g) of the Re-

statement of the Law of Torts (2d Ed.) as follows:

> "The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained."

This case also held that proximate cause is not to be presumed, but must be proved, citing a number of cases, including Mannsz v. Macwhyte Co., 3 Cir., 155 F.2d 445; Cudmore v. Richardson-Merrell, Inc., 398 S.W.2d 640, Texas Civil Appeals, Dallas, 1966 writ RNRE.

The case of Mannsz v. Macwhyte Co., supra, in which a wire rope broke while it was used to support the scaffolding to which it was attached fell, held that the rope was not being used for the purpose for which it was made or intended to be used, and that therefore the manufacturer was not liable. It was also said that the use of the rope to support a scaffolding was not a purpose specified. This case has been frequently cited with universal approval.

■ In the instant case, Lykes was a long time user of the wire rope sold by Paulsen-Webber. Paulsen-Webber in its brochure informed the users that it stood ready and was available for advice and assistance with regard to the use of their product. Lykes did not ask for and therefore did not obtain from Paulsen-Webber any such information. It is quite significant that no one appeared from Lykes gear room, where the snodders or slings were made, as witnesses in this case, nor was this failure explained. Lykes, from their long experience with wire rope, should have known of the strength, quality and proper use of the wire rope.

In Thibodaux v. McWane Cast Iron Pipe Co., 5 Cir, 1967, 381 F.2d 491, Judge Gewin, in affirming the district court's action in granting a direct verdict said:

> "Appellant seeks relief under the manufacturer's liability doctrine relating to the duty to warn of known danger inherent in a product or in its contemplated use. A product is inherently or imminently dangerous if the nature or quality of the article is such that it will place life or limb in peril or if the product when applied to its intended use is such that it will endanger human life or property."

In Simpson Timber Co. v. Parks, 9 Cir., 369 F.2d 324, reversed 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319, a case in which both Lykes and Paulsen-Webber discussed in their briefs at great length, as well as the decision of the Supreme Court in the same case. This case is not controlling here because the product in that case was in the same condition at the time of the mishap as when delivered. Here, the product had been fabricated and rebraided by Lykes and incorrectly so. The product was not being used for its intended use at the time of the accident.

From all the facts and circumstances, I hold that the claim for indemnity by Lykes against Paulsen-Webber should be, and hereby is, denied.

The Court has jurisdiction of the parties and the subject matter.

No attorneys' fees are allowed to any of the parties herein.

The allowable costs of this proceeding are all taxed against Lykes.

The above and foregoing shall constitute the findings of fact and conclusions of law herein.

The Clerk will notify counsel.